UNITED STATES v. GREAT LAKES TOWING CO. et al.

(District Court, N. D. Ohio, E. D.     February 11, 1913.)

No. 8,003.

1. MONOPOLIES (§ 12*)—ANTI-TRUST ACT—"COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE."

A combination formed for the express purpose and with the express intent of eliminating the natural and existing competition in interstate commerce, and of monopolizing and restraining such commerce by the employment of unusual and abnormal methods of business, or which places the direct instrumentalities of interstate commerce in such a relation as to create a single dominating control in one corporation, whereby natural and existing competition in such commerce is unduly restricted or suppressed, is one in violation of Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 2, pp. 1275, 1276; vol. 8, p. 7606.]

2. COMMERCE (§ 17*)—INSTRUMENTALITIES OF INTERSTATE COMMERCE—TOWING TUGS.

Tugs employed in the business of towing into and out of harbors and between ports vessels engaged in interstate commerce, and in the lightering and wrecking of vessels so engaged, are themselves instrumentalities of interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 10, 11; Dec. Dig. § 17.*]

3. MONOPOLIES (§ 12*)—CONTRACTS IN RESTRAINT OF INTERSTATE COMMERCE—ANTI-TRUST ACT—"UNREASONABLE RESTRAINT OF TRADE."

While the sale of a business and the surrender of the good will pertaining thereto and an agreement thereunder, within reasonable limitations as to time and territory, not to enter into competition with the purchaser, when made as part of the sale of the business, and not as a device to control or monopolize interstate commerce, is not within federal Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), the imposition of a restraint greater than necessary to afford fair protection to the legitimate interests of the purchaser constitutes an unreasonable restraint within the act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 7, pp. 6185, 6186.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. MONOPOLIES (§§ 12, 16*)—ANTI-TRUST ACT—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE.

The Great Lakes Towing Company was organized in 1899, and shortly afterward acquired in its own name, or that of controlled companies, the property and good will of practically all local tug operators in 14 of the principal lake ports, not including Lake Ontario. These purchases were made under contracts which bound the sellers not to engage in the towing or wrecking business on any of the Great Lakes except Ontario for a period of five years. In this manner the company acquired some 120 tugs. It also made a contract with another owner whose tugs were not bought, by which he bound himself, in consideration of an annual payment to him in cash, not to do any towing on the Great Lakes for a term of five years. Whenever local competition later developed, the company at least met any cut rates at that port, even at a serious loss, until competition was ended, after which rates were restored. It adopted a system of exclusive contracts with vessel owners by which, in consideration of their giving it all their towing and wrecking business throughout one or more seasons at all ports where it did business, it gave them a large discount from its tariff rates, with a guaranty that the contract rates, taken together, should not exceed the sum of the rates they might otherwise obtain by reason of the cutting of rates by competitors. By means of such contracts it obtained control of 90 per cent. or more of the towing business at such ports, and, together with the other means stated, acquired a practical monopoly of such business. *Held*, that such company and its controlled companies were clearly organized and operated with the purpose and effect of securing a monopoly, and constituted a combination in restraint of interstate and foreign commerce in violation of Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. §§ 10, 12; Dec. Dig. §§ 12, 16.*]

In Equity. Suit by the United States against the Great Lakes Towing Company and 51 other defendants. Hearing on pleadings and proofs. Decree for complainant.

U. G. Denman, U. S. Atty., of Cleveland, Ohio, and E. P. Chamberlin, Sp. Asst. U. S. Atty., of Bellefontaine, Ohio, for complainant.

Goulder, Day, White & Garry, and Hoyt, Dustin, Kelley, McKeehan & Andrews, all of Cleveland, Ohio (Harvey D. Goulder and Hermon A. Kelley, both of Cleveland, Ohio, of counsel), for defendants.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

PER CURIAM. The United States filed its petition in equity against the Great Lakes Towing Company, the Dunham Towing & Wrecking Company, the Union Towing & Wrecking Company, the Thompson Towing & Wrecking Association, the Hand & Johnson Tug Line, the Pittsburgh Steamship Company, and 46 other defendants, corporate and individual, charging the maintenance of a monopoly in transportation of persons and property in commerce between the States and with Canada, and a combination in restraint of such commerce, in violation of Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), known as the "Sherman Act." The specific monopoly and restraint charged relate to the business of vessel towing on the Great Lakes; the proofs being specially directed to the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

harbors of Duluth, Sault Ste. Marie (Michigan), Port Huron, Detroit, Chicago (embracing South Chicago, Gary, Whiting, and Indiana Harbor), Toledo, Sandusky, Lorain, Cleveland, Fairport, Ashtabula, Conneaut, Erie, and Buffalo (including Tonawanda and Black Rock).

Previous to and in the year 1899 the towing into and out of the harbors mentioned of vessels engaged in commerce on the Great Lakes was done by independent tug or towing companies, or individuals opperating each at only one port, or, at most, at two or three ports in the immediate vicinity of each other. These tug operators were, generally speaking, in active competition with other operators (if any) at the same port, although competition was sometimes and in some places suspended by arrangements for operation on joint account, or for division of business. At Chicago were the Dunham Towing & Wrecking Company, with 17 tugs and a wrecking outfit, the Barry Bros. Towing Line, with 10 tugs, and the Hausler & Lutz Towing & Dock Company, with 3 tugs; at Buffalo, the Hand & Johnson Tug Line and the Maytham Tug Line, each with 7 tugs and a one-half ownership in a fifteenth tug; at Tonawanda were Hartman and others, with 5 tugs; at Erie and Conneaut, Ash and his associates, with 3 tugs; at Duluth, the White Line Towing Company, with 8 tugs, one lighter, and one scow, and the Inman Tug Company, with 8 tugs; at Cleveland, the Vessel Owners' Towing Company, with 10 tugs, the Cleveland Tug Company, with 5 tugs, and J. C. Gilchrist, 1 tug; at Toledo, Sullivan, usually with at least 8 tugs, and Nagle, with usually 3 tugs; at Ashtabula, the Ashtabula Tug Company, with 6 tugs; at Port Huron, the Thompson Towing & Wrecking Association, with 12 tugs and 3 lighters; at Bay City, James Davidson, with 2 tugs; at Huron, Dewhirst and others, with 2 tugs; at Fairport, the American Transportation Company, with 2 tugs; at Escanaba, the Escanaba Towing & Wrecking Company, one tug and wrecking appliances; at Sault Ste. Marie, Mich., the Soo River Lighter & Wrecking Company, with two lighters; at Detroit, the Westcott Wrecking Company, Limited, with one steamer, and the Isaac Watt Wrecking Company, Limited, with one steamer; at Cheboygan, the Swayne Wrecking Company, with one steamer. While the list above given is not absolutely complete, it is nearly so, and is sufficiently complete for present purposes.

In the spring of 1899 the Great Lakes Towing Syndicate was formed, for the purpose of acquiring towing and wrecking properties, a committee of this syndicate being sent out to inspect, appraise, and take options on such properties. The Great Lakes Towing Company was organized July 6, 1899, under the laws of New Jersey, with an authorized capital stock of $5,000,000, the first of the purposes stated in the certificate of incorporation being—

"to do a general towing, wrecking, salvage, dredging and contracting business on the Great Lakes, in all the harbors thereof, and in all streams and waters tributary thereto, or connected therewith and elsewhere."

The promoters of this organization were largely, if not exclusively, persons heavily interested, directly or by representation, in transportation on the Great Lakes (notably of coal, oil, and ore); some being

interested in producing as well as in vessel owning and operating, others being interested in docking facilities. Through this syndicate, and on or before August 22, 1899, the Great Lakes Towing Company purchased the properties (in case of corporate vendors, their entire capital stocks or properties, or both) of the various tug owners and operators mentioned in the margin of this opinion,[1] these purchases embracing 74 tugs, 6 lighters, and 1 scow. The aggregate net purchase price paid for these properties, as indicated by journal entries on the books of the Great Lakes Towing Company, was $3,112,930.92, the vendors receiving, in cash value, much less than the prices so indicated, in many cases receiving preferred stock in whole or in part payment, and not usually any considerable amount of common stock, which latter carried the voting power; the control being held by the promoters and those having like interests. Later in 1899 and in the early part of 1900, the Great Lakes Towing Company bought the properties of still other tug owners and operators, whose names are given in the margin,[2] such added purchases aggregating 34 tugs and 1 steamer. The Great Lakes Towing Company (which we shall hereafter call the Towing Company) thus immediately acquired all the properties of all the prominent towing operators at each of the 14 ports in question, except those of Nagle and Sullivan, at Toledo, and the two steamers of the Swayne and Isaac Watt Wrecking Companies, respectively. It will be seen that the control of these properties was soon afterwards acquired by the Towing Company, either by purchase or by contract.

The Union Towing & Wrecking Company was incorporated after the organization of the Great Lakes Towing Company, and was practically the successor of the Inman Tug Company and the White Line Tug Company, both of Duluth. It took over the properties of these two companies, as well as those of the Independent Towing Company, the Escanaba Towing & Wrecking Company, and the Soo River Lighter & Wrecking Company. The property of Barry Bros. (Chicago) was ultimately conveyed to the Dunham Towing & Wrecking Company. The properties of the Maytham Tug Line and one or more other companies were conveyed to the Hand & Johnson Tug Line. The properties operated at the lower lake ports were, for the most part, conveyed to the Great Lakes Towing Company, which also took, and has always held, the entire of the capital stock of the Hand & Johnson Tug Line, the Thompson Towing & Wrecking Association, the Union Towing & Wrecking Company, the Dunham Towing & Wrecking Company, and the Great Lakes Towing Company, Limited. All five

---

[1] The Maytham Tug Line, the Hand & Johnson Tug Line, Ash, and others, Ashtabula Tug Company, Vessel Owners' Towing Company, Thompson Towing & Wrecking Association, Soo River Lighter & Wrecking Company, James Davidson, White Line Towing Company, Inman Tug Company, and Barry Bros., Independent Tug Line.

[2] The Cleveland Tug Company, the American Transportation Company, the Westcott Wrecking Company, Ltd. (whose name was thereupon changed to the Great Lakes Towing Company. Ltd.), the Dunham Towing & Wrecking Company, the Escanaba Towing & Wrecking Company, Dewhirst, and others, Sault Ste. Marie Tug Company, Hartman, and others, and Gilchrist.

of these last-named companies have been kept alive, but the policy and activities of each of them, in all the ports in which they respectively do business, have at all times been absolutely controlled by the Great Lakes Towing Company, through boards of directors and otherwise. The other corporations whose stocks and properties were bought by the Towing Company have been treated as defunct, although they have not been formally wound up.

In connection with each of the purchases made by the Towing Company, whether in 1899 or subsequently, the vendors (and if corporate, usually their managers and principal stockholders as well) were required to and did agree in writing that during the succeeding five years they would "in all proper ways in their power, aid and assist the party of the second part (the Towing Company), its nominees, successors and assigns, in retaining, extending and successfully prosecuting the business" formerly conducted by the vendor; and that during the same period of five years they would not "directly or as shareholders, in or by or through any interest in any corporation, partnership or association, engage in or be interested, directly or indirectly, in the business of *towing and wrecking* or in any branch thereof, *upon the Great Lakes,* their harbors, connecting and tributary waters (except Lake Ontario and its harbors and the waters east thereof), excepting only and so far as they, or either of them, shall be interested in or with the party of the second part, as shareholder or employee." The Towing Company, at and within a few months following its organization, bought apparently more tugs than needed to do all the business required at the 14 ports, if properly distributed. Occasionally the Towing Company made sales of tugs, but always under agreement of the purchasers (and with attempt to make such agreement follow the title) that the tugs should not be used in vessel towing *at any of the 14 ports in question;* other ports as well being usually included in the restriction.

In 1900 Maytham's Towing & Wrecking Company was organized at Buffalo, and after a bitter and expensive competition with the Towing Company, its property, including 18 tugs, was in the following year bought by the Towing Company. Soon thereafter, and in 1901, the Independent Towing Company was organized at Buffalo, and after a long and aggressive competition (which in three months of 1903 cost the Towing Company $20,000, as compared with earnings in 1901) its property, likewise, was in 1903 bought by the Towing Company, and its manager taken into the latter's employ.

In connection with the purchase of the Independent Tug Company's property and business, an agreement was made with Sullivan for carrying on the towing business at Toledo and in the Detroit and St. Clair rivers on joint account, for a period of five years from January 1, 1904, each operator contributing an equal number of tugs, the business being conducted in the name of the Great Lakes Towing Company, with Sullivan as manager, under salary; the Towing Company agreeing not to do any other towing business at Toledo, and Sullivan agreeing not to do *any towing* except under the agreement in question, either alone or in association with others. This agreement was subsequently extended

208 F.—47

to January 1, 1910. In April, 1904, an agreement was made with Nagle whereby, in consideration of a fixed payment of $2,000 per year for five years, he agreed that none of his three tugs should, during that period, be used "in vessel towing business on the Great Lakes, their harbors, tributary and connecting waters" (there being, however, no restriction upon Nagle's use of the tugs for other than towing business), Nagle calling this annual payment "alimony," and an officer of the Towing Company characterizing it as "blackmail." This payment of $2,000 per year was made to Nagle solely to get rid of his competition (without buying his tugs), and without the requirement of any active service. In 1905 an agreement was made with the owners of three tugs, whereby one or the other of two tugs named was to be used on joint account with the Towing Company in wrecking and other work in the vicinity of Detroit, the owners agreeing that the third tug (which was not included in the joint account operation) should during the life of the contract do no wrecking work or vessel towing in Detroit river or elsewhere, with the same restrictions as to the first and second tugs (except upon request of the Towing Company), when not employed under the contract; the towing of dredges or scows and the towing of vessels in Canadian ports other than Anherstberg (where the Towing Company did business) being excepted. Other contracts for joint operation were made, but they are less significant than those to which we have called attention.

As early as 1900 the Towing Company adopted a tariff of service rates. For the first few years after 1899 there was occasional competition at various of the ports where the Towing Company operated. That at Buffalo has already been referred to. The Sullivan and Nagle arrangements grew out of competition at Toledo. At Duluth there was more or less competition as late as 1903, and at Chicago until 1905, and to a slight extent later. The record of correspondence between officers of the Towing Company and officers and managers of its subsidiaries, from 1899 on, abounds with expressions of determination to wipe out all injurious competition, and such policy was vigorously and aggressively pursued. Wherever rates were cut by competitors the cut was at least met. After competition ceased the rates were restored. We are not satisfied that the Towing Company started general rate cutting, and it may be that it did not cut below its competitors. Indeed, it would generally seem unnecessary that it should do so. Its policy, however, was "not to lose any business on account of not making the necessary rate to get it." Competitive practices were not limited to general rate cutting, but embraced special concessions in various forms, where necessary to get business away from the opposition.

The Towing Company adopted, as early as 1900, a system of exclusive contracts, by which, in consideration of the vessel owners employing *throughout the entire season* the Towing Company's *tug and wrecking* service *at all ports* covered by its tariffs (so far as the vessel owner had occasion for such service), a large discount was given from tariff rates. In 1910 a flat discount of 20 per cent. was given on all bills. The discount was at no time less than 20 per cent., and in later years

it varied with the class of service, ranging in 1910 from 20 per cent. on lake towing, boiler work, wrecking service, harbor towing of line boats, and first-class coarse-freight carriers, to 30 per cent. on lumber boats. No discounts were allowed except under such exclusive contracts. The vessel owner, moreover, was guaranteed that his contract rates, taken together, should not exceed the sum of the "cut rates" made to meet competition. As expressed by the Towing Company's president:

"The advantage of the contract to the vessel owner is that it saves him 20 per cent. on the tariff at all points, and even though there may be competition at some, and they cut rates, on the whole he would make a saving by doing business with us. And, again, should he be of opinion that there will be competition all along the line and the cut rates less than our contract rates, our contract protects him against that."

The Towing Company has long had a practical monopoly of harbor towing at the 14 ports. In May, 1900, its president advised the Buffalo manager that:

"Notwithstanding the heroic efforts made by the opposition company, we have secured practically all of the package freight boats, all of the ore and grain boats, and many of the lumber carriers, in all something like 500 boats, which we estimate represent fully 75 per cent. of the towing in dollars and cents which will be done on the Lakes this season. * * * As near as we can figure, if all the uncontracted towing was done by the opposition, they still would not earn sufficient money to pay their operating expenses."

As written by the Towing Company's secretary in April of the same year:

"I believe we now have about enough of the ore boats pledged to us so that the opposition could not put a tug into Lorain, or any other Lake Erie points between Cleveland and Buffalo, and half make living expenses."

In the same month the Towing Company's president wrote the president of the Union Towing & Wrecking Company, at Duluth:

"It seems to us now that there will be no occasion to make a general cut in rates unless it is for the lumber trade, and if we can fix it so that we do not have to open up the rates in the lumber business, I think we can put the other fellows to sleep and not impair our own revenue."

In June of the same year the Towing Company's secretary wrote a Canadian vessel owner, in soliciting him to make an exclusive contract:

"We have contracts now with about 80 per cent. or 90 per cent. of all the boats using tugs on the Great Lakes, for all their service."

The lumber carrying vessels were the hardest to secure. To this end an aggressive campaign was made through the Lumber Carriers' Association. In July, 1903, the president of the Towing Company was claiming that "over 90 per cent. of the entire lumber tonnage has contracted with us to do all of their work for from one to five years"; and in November, 1903, upon the purchase of the Independent Towing Company at Buffalo, and the making of the contract with Sullivan respecting the Toledo situation, the Towing Company's president reported to its executive committee that "this eliminates all the opposition the Great Lakes Towing Company has that looks at all dangerous." It is entirely safe to say that since 1904 the Great Lakes Towing Com-

pany has had no real competition in harbor towing at either of the 14 ports, except to a limited extent at Chicago for a little later period, and that it now controls 95 per cent. of the harbor towing on the Great Lakes at the 14 ports concerned.

The Towing Company does not monopolize the wrecking business as completely as that of harbor towing. There are several wrecking companies doing an active business, especially under employment by underwriters, who, having no need of towing service, are of course unaffected by the exclusive contracts employed by the Towing Company. The Towing Company's port to port towing business amounts to but about 2 per cent. of its total business, although in dollars and cents aggregating a substantial amount.

The Towing Company contends that the combination represented by it does not constitute an unreasonable restraint upon or monopoly over commerce, and thus is not within the condemnation of the Sherman act; that it is in effect merely a protective association organized for the mutual benefit of its members and promoters, whose principal expectation of gain lay in the benefits expected to accrue from improvement of the towing and wrecking service rendered their vessels, and whose purpose was not to create a monopoly nor to restrain commerce, but to facilitate it. It is shown that the size of steam vessels carrying bulk freight on the Great Lakes increased, during the five-year period preceding 1900, from 300 to 500 feet in length, and from 3,000 to 4,000 tons to 7,000 or 8,000 tons carrying capacity (a further increase having taken place since); that a similar increase took place with respect to the size and capacity of passenger steamers; that the increase in the size of freighters was accompanied by a corresponding increase in facilities for loading and unloading, through the substitution of the clam shell (and its predecessor, the scoop bucket) for the former slow method of raising by crane or derrick buckets filled by hand in the vessel's hold. Defendants contend that the towing and wrecking facilities furnished at the important ports on the Great Lakes were totally inadequate to meet this increase in the size and number of vessels; that while there were frequently tugs enough in commission, if they could be utilized, to meet the demands for harbor towing, at many of the ports a ruinous system of cut-throat competition existed, whereby the larger tugs were used for "scout service" in meeting vessels many miles from the harbor, leaving small and insufficient tugs to do the actual harbor towing, this resulting in lack of system for furnishing tugs, absence of system of delivering orders to ships, and of uniform system for notifying incoming vessels where they belonged, accompanied by graft, lack of fixed tariffs, and by other demoralizing incidents; that at times competing concerns made arrangements for division of business, whereby each tug line was to do all the towing of vessels belonging to certain owners, the latter having nothing to say as to what tugs should serve them; that many of the tug companies were financially irresponsible, and vessel owners were thus left without adequate remedy for negligent or unskillful towing; that before the formation of the Great Lakes Towing Company some of the larger vessel interests were considering forming individual tug lines for their own

service. It is also contended that the ice breaking tug service at the great grain ports of Duluth, Chicago, and Buffalo was inadequate. It is shown that, in the organization of the Great Lakes Towing Company, vessel owners contributed allotted amounts and took corresponding portions of stock, the vessel owners being expected to give their business to the new association; that the promoters tried first to buy out all tug operators at ports where bulk freighters did much business, instead of driving such operators out of business. It is also shown that the Towing Company has so increased the power and changed the construction of ice breaking tugs as to lengthen the navigation period at the great grain ports by three weeks each year; that harbor towing service has been improved, delays largely eliminated, the delivering of orders systematized, and a responsible concern substituted for a number of concerns, some of whom were not responsible. Finally, it is urged that in the towing service a natural monopoly is impossible; that the organization of the Towing Company is practically a mere unification of the system of harbor towing, analogous to railway terminal service, and that in the absence of a natural monopoly such mere unification is not objectionable, the language of the decision in the St. Louis Terminal Case being invoked as decisive of the legality of the Towing Company's status.

[1] The general propositions applicable to the facts presented are too well settled to justify much discussion. The Sherman act in terms declares illegal every combination, in whatever form and of whatever nature, which directly or necessarily operates in restraint of trade or commerce among the several states or with foreign nations. Northern Securities Co. v. United States, 193 U. S. 197, 331, 24 Sup. Ct. 436, 48 L. Ed. 679, and cases there cited. While by its later decisions the Supreme Court has interpreted the statute as not restraining the "power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose," and has declared that the words "restraint of trade" should be given a meaning which would not destroy the individual right of contract and render difficult, if not impossible, any movement of trade in interstate commerce, the free movement of which it was the purpose of the statute to protect (Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 179, 31 Sup. Ct. 632, 55 L. Ed. 663; United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243), it may yet be regarded as well settled that a combination formed for the express purpose and with the express intent of eliminating natural and existing competition in interstate commerce, and of monopolizing and restraining such interstate commerce, by the employment of unusual and abnormal methods of business, constitutes undue restraint or suppression, and so offends against the anti-trust act (Standard Oil Co., supra; American Tobacco Co., supra; Reading Case, supra); and that a combination which places the direct instrumentalities of interstate commerce in such a relation as to create a single dominating control in one corporation, whereby natural and existing competition in interstate

commerce is unduly restricted or suppressed, is within the condemnation of the act (Standard Oil Co. Case, supra; American Tobacco Co. Case, supra).

[2] We entertain no doubt that tugs employed in the business of towing, into and out of harbors and between ports, of vessels engaged in interstate commerce, and in the lightering and wrecking of vessels so engaged, are themselves instrumentalities of interstate commerce. Foster v. Davenport, 63 U. S. (22 How.) 244, 16 L. Ed. 248; Moran v. New Orleans, 112 U. S. 69, 5 Sup. Ct. 38, 28 L. Ed. 653; Harmon v. Chicago, 147 U. S. 396, 13 Sup. Ct. 306, 37 L. Ed. 216. It inevitably follows that any undue restraint upon such business of towing and wrecking offends against the Sherman act.

[4] The intention of the Great Lakes Towing Company and its promoters to obtain complete control of the towing and wrecking service in at least the 14 ports mentioned is, we think, clearly established by the considerations to which we have referred. Referring to the more prominent of those considerations:

[3] While the sale of a business and the surrender of the good will pertaining thereto, and an agreement thereunder, within reasonable limitations as to time and territory, not to enter into competition with the purchaser, when made as part of the sale of a business, and not as a device to control commerce, is not within the federal Anti-Trust Law (see authorities cited in Darius Cole Transp. Co. v. White Star Line [C. C. A. 6] 186 Fed. 63, 65, 108 C. C. A. 165), the imposition of a restraint greater than necessary to afford fair protection to the legitimate interests of the purchaser, or contractor, constitutes an unreasonable restraint under the Sherman act. Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865. The fact that the restraint of competition was not limited to the locality where the seller was doing business, but was made to extend to *all harbors* upon the Great Lakes (except Lake Ontario), tends to show an intention on the part of the Towing Company to get more than reasonable protection incidental to the good will of the business sold. Likewise the restrictions upon competition imposed in the case of all the joint operating contracts referred to were greater than necessary for the protection of the Towing Company's legitimate business interests at the *local service* points covered by such contracts. No more effective method could well be devised for unifying the towing interests in question than by combining in one corporation the stocks of a large number of other corporations creating such a comparatively vast capitalization and influence. Such unification, unexplained, justifies a presumption of an intent to dominate and control the towing facilities. Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. The fact that the policy of the Towing Company's promoters was to buy out competitors, rather than to buy new tugs, and by competition compel the loss to other tug owners of their property, does not tend to negative an intent to create a monopoly. Such course, as avoiding expensive competition, was entirely consistent with an intent exclusively to occupy the field. A

wicked purpose to wreck the property and business of those then engaged in towing is not essential to a violation of the statute.

The Towing Company's object in employing the system of customers' exclusive contracts was clearly to make successful competition impossible. As written by the Towing Company's president during the competition at Buffalo in 1903:

"Some of the line managers, and a very large per cent. of the vessel owners, have been induced to contract with this company, with the understanding that those who remained outside when the opposition was destroyed would have to pay the full tariff rates."

That these contracts greatly contributed to the suppression of competition is likewise clear. They enabled the Towing Company to do each year a profitable business, despite competition at certain localities which would have been ruinous to an operator in that one locality, for rate cutting at one port did not affect the regular tariff rates at any of the other ports. As expressed by the Towing Company's secretary in 1900:

"As a matter of fact  *  *  *  these contracts are what are saving us from having the business entirely demoralized at all points."

It is true that the Towing Company has not attempted to do business on Lake Ontario or at any of the nearly 40 other harbors on the Great Lakes enumerated in the margin.[3] But this fact has nothing to do with the question of defendants' attempt to monopolize business at the 14 ports in question. It is not necessary to a violation of the federal statute that a complete monopoly of all towing on the Great Lakes be effected. Northern Securities Co. v. United States, 193 U. S. 197, 332, 24 Sup. Ct. 436, 48 L. Ed. 679. A monopoly in 14 ports is as offensive against the act as a monopoly in 50 ports. We may remark, in passing, that we are satisfied that the business at none of the ports outside the 14 in question (unless it be Milwaukee) was such as to be attractive to the Towing Company.

We do not doubt that in 1899 the tug service, both towing and wrecking, at certain of the lake ports in question was unsatisfactory, although from the fact that no new tugs were built by the Towing Company for 7 years thereafter (and but four in 10 years) and no new lighters or wrecking appliances acquired during the first four years, it would appear that there was in 1899 no great dearth of tugs, or even of tugs of sufficient size, if properly employed. The question is whether the unsatisfactory towing facilities, including their practical operation, justified the making of this combination. Of the claim that the Towing Company was merely a mutual protective association, it is enough to say that defendants' contentions in this regard are not sustained. Not all, or even nearly all, vessel owners needing the service

[3] Two Harbors, Minnesota; Ft. William, Port Arthur, Michipicoten, Parry Sound, Depot Harbor, Midland, Collingwood, Owen Sound, Kincardin, Goderich, Port Dalhousie, Canada; Ontonagon, Houghton and Hancock, Manistique, Gladstone, Cheboygan, Petoskey, Traverse City, Manistee, Ludington, Muskegon, Grand Haven, Holland, South Haven, Benton Harbor, Alpena, Saginaw, Bay City, Harbor Beach, Mich.; Menominee, Green Bay, Two Rivers, Manitowoc, Sheboygan, Milwaukee, Racine, Kenosha, Waukegan, Wis.

in question were included as (or even invited to become) members of the association. Nor can we assent to the suggestion that the combination was not organized for profit. The betterment of the service was unquestionably one of its attractive features, and probably the leading one; but we are satisfied the promoters confidently anticipated a profitable operation, and that but for such anticipation the combination would not have been formed. Cogent evidence of this conclusion is found in the declaration of the Towing Company's directors on August 16, 1899, that the properties proposed to be taken by the syndicate—

"had made net earnings which in the aggregate would pay a fair interest on $3,500,000 [much more than was proposed to be paid for the properties], which net earnings will undoubtedly be largely increased as a result of single management and of combined operation of the properties."

It is also to be noted that the officers reported to the stockholders in 1901 that the company had earned during the season of 1900, "in spite of a bitter competition" (principally the Maytham competition, it would seem), a net undivided profit of over $90,000, after paying 7 per cent. on the preferred stock. The dividend was passed, however, so as to leave the company strong to meet such competition the next season. We are satisfied that the Towing Company's operations have proved financially profitable to its stockholders.

The fact that the towing and wrecking service has been improved under the Towing Company's administration cannot legalize the combination if otherwise unlawful. Not only do good motives furnish no defense to a violation of the anti-trust act (Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107), but we have no right to assume that the unsatisfactory conditions existing in 1899 could not have been eliminated by lawful and normal methods.

Has the Towing Company acquired this domination of the towing and wrecking service by normal methods alone; or, as otherwise stated, has it unduly restrained or suppressed competition? We think it clear that the Towing Company's domination does not result from normal methods alone. Whatever may be the views of individual economists, under the federal statutory policy normal and healthy competition is the law of trade; and such evils as may result from such competition must be considered less than those liable to follow a complete unification of interests and the power such unification gives. The evil of unification lies in the temptation to higher rates and lessened regard for the public interests; and the tendency to this evil result must be recognized, even though not in a given case yet realized in actual experience. United States v. Union Pacific R. R. Co., 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124; Joint Traffic Association Case, 171 U. S. 505, 576, 19 Sup. Ct. 25, 43 L. Ed. 259; Standard Sanitary Mfg. Co. v. United States, supra. Even competitive practices, of a nature which as between business rivals standing practically on equal terms may be normal and lawful, yet when employed by a powerful monopolistic combination with the ability to crush, and for the purpose of crushing, a weak rival, may become abnormal and unlawful. It needs no discussion to demonstrate that complete unification of the

towing and wrecking facilities at 14 principal ports, accompanied by restraints with respect to competition imposed upon the sellers of towing properties in excess of the legitimate protection necessary to the preservation of the business purchased, excessive restrictions against competition under joint operating contracts and on sales of tugs, bitter rate wars, and a system of exclusive contracts with customers such as is found here, all adopted or engaged in for the purpose of effectuating monopolistic control, are abnormal methods of doing business and eliminating competition, and that a restraint of natural competition by such means is undue restraint. We think the St. Louis Terminal Case (224 U. S. 383, 32 Sup. Ct. 507, 56 L. Ed. 810), so far from sustaining the legality of the combination maintained by the Towing Company, contains a direct denial of such legality. It was there held that the unification of substantially every terminal railroad facility by which the traffic of St. Louis is served constituted a combination in restraint of trade. It is true that the court, speaking through Mr. Justice Lurton, there said:

> "It cannot be controverted that, in ordinary circumstances, a number of independent companies might combine for the purpose of controlling or acquiring terminals for their common but exclusive use. In such cases other companies might be admitted upon terms or excluded altogether. If such terms were too onerous, there would ordinarily remain the right and power to construct their own terminals. But the situation at St. Louis is most extraordinary, and we base our conclusion in this case, in a large measure, upon that fact"

—the fact referred to being the "physical or topographical conditions peculiar to the locality"; the route exclusively occupied by the combination being the only practical route for entering the city. It was also held that the terminal was not under a "common control and ownership," because all needing its use were not admitted to an "equal control and management upon an equal basis with the present proprietary companies." To our minds there is a strong analogy between the "physical or topographical conditions" existing in the St. Louis Terminal Case and the artificial condition created by the Towing Company. A prominent vice of the situation before us is that there are here involved 14 separate "terminals," no one "terminal" being allowed to stand by itself; that the towing facilities furnished at each "terminal" (speaking more especially with respect to prices) are not furnished to all on equal terms as respects the service at that "terminal," but discrimination is made for or against a customer according to whether he does or does not give the Towing Company all his business (not merely towing, but wrecking as well) at each of the other "terminals" covered by the Towing Company's tariffs. No more effective obstacle to successful competition could well be devised than is found in this exclusive contract system. It is manifest that no competitor doing business at less than all 14 of the ports could compete with the Towing Company on anything like equal terms. With the field already occupied by a strong combination, with a large patronage fixedly secured through stockholding interests, the formation of another company equipped to do business at all 14 ports would seem a commercial and financial impossibility. The Towing Company seems to have ap-

preciated this condition, for as early as April, 1900, its president wrote the local manager at Buffalo:

"I think you can safely assert that there is no one concern or combination of concerns that can carry out promises and take care of the vessel towing at all the ports all the time without at least 60 tugs. Taking all the tugs, outside our own, engaged in the vessel towing business, there is not one third of this number, including the poor ones, which are in a majority"

—and in August of that year, during the Maytham competition at Buffalo, the Towing Company's president did not believe that the Maythams, "notwithstanding their good reputation and conservative business principles," could "possibly induce capital to invest to the extent of $200,000." Yet several times that sum was paid on the very first purchase of towing facilities made by the Towing Company.

It is urged that all vessel owners already enjoy all the rights which by the decree in the St. Louis Terminal Case were given outside railroads, in that all such vessel owners are at liberty to buy stock in the Towing Company, upon the market, and thereby participate in the ownership and management of that company's business. But all may not be able to acquire large stock interests, and the rights of minority stockholders may well fail to assure that "equal control and management upon an equal basis" with all other vessel owners, including the stockholders in the Towing Company, which would be necessary to make the relief analogous to that required in the Terminal Case. We see, however, no substantial analogy in this respect between the vessel owners here and the railroads in the Terminal Case. The analogy is rather between the railroads there and the tug companies here.

We conclude that the Towing Company and the corporations controlled by it constitute a combination denounced by the anti-trust act. We thus come to the question of the remedy to be applied. The general principles affecting this subject are that the continuation of the prohibited acts should be forbidden, and that the combination should be so dissolved as to neutralize the force of the unlawful power; that this result should be accomplished with as little injury as possible to the interests of the general public, and with due regard to vested property interests innocently acquired. In cases where the illegality of the combination results alone from purely administrative conditions, which may be effectively eliminated, a prohibition of the offending practices may be sufficient to vindicate the statute. Standard Oil Case, supra; St. Louis Terminal Case, supra; Union Pacific R. R. Case, supra.

The complete elimination of the offending administrative practices to which attention has been called, including (as the more prominent) customers' exclusive contracts and destructive rate competition (especially as applied to temporary rate reductions in particular harbors), and including all unfair advantages possessed by the Towing Company by reason of its size, financial strength or connections, accompanied by the according of equal and "most favored" treatment to all vessel owners, regardless of the amount of their business, and whether or not they are stockholders in the Towing Company, and whether or not they in fact exclusively patronize that company wherever it does

business (thus, and in all other ways, safeguarding the rights of all others engaged or wishing to engage in towing), would greatly lessen the presently existing evils, and possibly might substantially remove them. But, having in mind the magnitude of the combination and the extent of its activities, and the fact that it was organized to secure a monopoly, as well as for the benefit and profit of its members, together with its present practical occupancy of the territory, thereby placing all would-be competitors at such great disadvantage as practically to deter them, in large measure, from entering the field; together with the further fact that the decree of this court commanding the cessation of purely administrative practices would not be self-executing— it seems unlikely that a decree merely enjoining administrative practices would give complete relief, in the absence of radical change in fundamental principles upon which the Towing Company is organized and operated.

If the Towing Company shall present a feasible and satisfactory plan whereby its service shall be given for the equal benefit of all requiring the same (accompanied by a complete elimination of the offending administrative practices mentioned), so that the company becomes in truth "the bona fide agent and servant" of every vessel owner who shall use or need its facilities, and so that the rights of competitors are completely safeguarded, the injunction need only forbid continued operation except in full compliance with the terms of such plan; and the Towing Company is given 30 days for presenting such plan, if it cares to do so. Otherwise, the parties will be heard upon a plan for the dissolution of the combination, and upon the form of a decree for injunction, and receivership if necessary, to effectuate such dissolution. The question against what ones of the defendants injunction should issue is reserved until the precise form of relief is determined.

The proof does not show that the Pittsburgh Steamship Company has been a party to the combination charged, and counsel for complainant so concedes. As to that defendant the bill of complaint should be dismissed with costs.

No decree or order under this opinion will be entered until further directions.