## HAND & JOHNSON TUG LINE v. CANADA S. S. LINES, Limited.

(Circuit Court of Appeals, Sixth Circuit. May 12, 1922.)

No. 3630.

1. Towage ⟐11(7)—Tug has sole responsibility for movement, in absence of contrary agreement.

A tug engaged in moving a steamship, which is without steam and unable to participate in the movement, has the sole responsibility for directing the movement, and is liable for collision with dock and injury to the steamship, in the absence of an agreement that the steamer should watch, and give the tug warning and information.

2. Evidence ⟐71—Proof of mailing properly addressed letter raises presumption of delivery.

Proof that a letter, properly addressed and stamped and bearing the sender's return address, was deposited in the same mail as two other letters adressed to other offices of the libelant, and that the other two

letters were received, raises a presumption, which, however, is rebuttable, that the first letter was received.

3. **Evidence ⊛89—Evidence held not to rebut presumption letter was received.**

Where a letter containing the tariffs of a towing company was properly mailed to the accounting department of a steamship company, evidence that the letter was not received in the operating department of the steamship company, at which it would have been received, in the absence of such direction, and was never seen by any of the executive officers of the company, without proof it was not received in the accounting department, or search made there for it, and that the steamship company paid bills rendered in accordance with the tariff, *held* not to rebut the presumption the letter was duly received.

4. **Appeal and error ⊛1022(1)—Concurrent findings of master and court cannot prevail on issue not dependent on credibility.**

The respect due to the concurrent findings of the master and trial court cannot prevail over what the appellate court thinks is the reasonably clear and fairly necessary inference from the proofs on an issue not depending at all on the credibility of the witnesses, who were personally seen.

5. **Corporations ⊛428(1)—Cannot avoid responsibility by showing written notice by mail went to wrong department.**

A corporation cannot avoid responsibility by showing that, when a written notice by mail was received in its general office, it was sent to the wrong department.

6. **Towage ⊛3—Express assent to tariffs is unnecessary to make them part of the contract.**

Where a towing company had mailed to a steamship company a copy of its regular tariffs, the towing company can assume that a request for towage was made pursuant to that offer and on the conditions thereon stated, so that no express assent was necessary to bind the steamship company to such conditions.

7. **Towage ⊛3—Provision of contract limiting liability for demurrage held valid.**

The provision in a contract for towage limiting the liability of the towing company for demurrage in case of delay to a vessel due to the tug's fault to $100 per day, unless an increased rate has been paid for increased demurrage, is valid.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Libel in admiralty by the Canada Steamship Lines, Limited, against the Hand & Johnson Tug Line. Decree for libelant, and respondent appeals. Decree vacated, and case remanded for the entry of a modified decree.

Thomas H. Garry, of Cleveland, Ohio (Kelley & Cottrell and Goulder, White & Garry, all of Cleveland, Ohio, on the brief), for appellant.

Theodore C. Robinson, of Cleveland, Ohio (Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. In April, 1918, the appellant's tug Buffalo undertook to shift the appellee's steamer Cadillac from one dock to another in the harbor at Erie. The Cadillac was without steam and could not actively participate. In the final stage of the transfer the steamer was being pushed sternwards and angling toward the dock,

which was on the steamer's port, and the tug and the steamer were lashed port bow to port bow. Owing to the position of the boats and the length of the steamer, the tug's captain, in his pilot house back some distance from his bow, could not see the dock at the point of approach, although it could constantly have been seen by the tug's lookout, if there had been one at the extreme forward point. The steamer was driven into collision with the dock, causing damage to the steamer, on account of which it libeled the tug. The District Court held the tug at fault. Upon the accounting for damages, it appeared that the steamer was long delayed in dry dock during repairs, and that its current earnings during that period would have been about $300 per day. The rate tariff of the tug company provided that its liability for such a demurrage should not exceed $100 per day. The trial court held that the limitation was ineffective, and gave judgment for the full demurrage.

[1] The matter of fault turns upon a question of fact: Was there an agreement between the tug and the steamer that the steamer should watch the approach to the dock, and give the tug warning and information as the boats came in? Such an agreement will exonerate the tug (The Harvey D. Goulder [D. C.] 211 Fed. 683; Gilchrist Co. v. Great Lakes Co. [D. C.] 237 Fed. 432); but, lacking such agreement, the steamer has no right to participate in directing the movement, and the sole responsibility rests upon the tug. The cases to this effect are cited and reviewed in The Teaser (C. C. A. 3) 246 Fed. 219, 158 C. C. A. 379. Upon a review of the evidence, and even without giving controlling effect to the findings below, the existence of such agreement is not established in that satisfactory way necessary to avoid an otherwise clear legal liability. Upon the subject of fault we affirm the decree below.

The appellant is one of the subsidiaries of the Great Lakes Towing Company. That company annually publishes a schedule of tariff rates and charges for all customary services offered by it in any of the ports which it serves. Publication and posting of such tariffs, and strict adherence thereto, without any discrimination as between boats or owners served, were ordered by the United States District Court for the Northern District of Ohio in 1913 upon the hearing of the suit brought by the United States to enjoin the further maintenance and operation of the company in violation of the Anti-Trust Act (Comp. St. § 8820 et seq.). United States v. Great Lakes Towing Co. (D. C.) 208 Fed. 733, and 217 Fed. 656, 661. Such publication and conduct were prescribed as conditions on which the company might continue to do business. The practice has ever since been followed in all the ports of the United States on the Great Lakes, including Erie, and there has never been any complaint, as the decree provided there might be, if its provisions were not strictly observed. During this period the appellee has operated a large number of boats, constantly calling for the towing services of the Great Lakes Towing Company, at many, if not all, of these ports. While the Great Lakes Towing Company is not a common carrier subject to the Interstate Commerce Act (Comp. St. § 8563 et seq.), it was by this decree, and as to the ports where it might from time to time

operate, put substantially upon that basis. The United States, acting through its laws and its courts, had directed that the towing service here rendered should not be given, except pursuant to a regular and common tariff.

It is forcefully said that the decree must be deemed to have been of general notoriety; that the public should be held to the same basis in its dealings with the Towing Company, so far as this feature is concerned, as in its dealings with the railroads; and that it must be presumed that all persons asking towing services knew that the rates and conditions were regulated by public and invariable tariffs. Further, it is conceded that the appellees knew this general practice, and in one or more former years had received at its general office in Montreal the published pamphlet containing the rates (though not the particular condition now involved). For the appellant to have made any towing contract with appellee, except upon the same terms offered to all by the regular tariff conditions, would have been a contempt of court.

Giving due effect to the decree—which to this extent has the force of law—requiring common tariffs and to the unquestionably general notoriety of their existence and controlling effect, and to the confessed knowledge of appellee on the general subject, we greatly doubt whether appellant was bound to establish that the copies of this year's tariff were actually received by appellee at Montreal; but we do not rest the decision upon this impression, because we think the evidence of such actual receipt is fairly satisfactory.

[2] It appears without dispute that a copy of this tariff pamphlet and a copy of a circular letter calling special attention to the very provision now in question were separately duly addressed and mailed from the Towing Company's general office at Cleveland to the appellee at its general office in Montreal. These envelopes were especially marked for the "Accounting Department." At the same time two similar inclosures were in the same way mailed to the appellee at its office in Toronto. All of these envelopes carried the common return address card. Those which were sent to Toronto were admittedly received by appellee; but it is said that the authority of the Toronto agents was insufficient to cover the subject-matter. Under these circumstances an inference of fact arises that the communications were actually delivered to the addressee at Montreal.

[3] True, this is a disputable presumption; but the evidence in this case does not overcome it. It appears from appellee's proofs that its general office in Montreal has a large number of employés and is divided into departments, and that incoming mail was then customarily received by a mail clerk who opened the envelopes and distributed the letters to the proper department. Its managers say that this pamphlet, if received, should have been distributed to the operating department, that being the proper one; but the mail clerk says that, if the envelopes were marked for the accounting department, he would have sent them there without undertaking to correct the distribution. Each one of the executive officers and acting officers says that he never saw this tariff, but each one also says that he would not naturally have seen it if it was received. The head of the operating department did not see it,

or know of it; but he did not know of other tariffs in former years that concededly were received. In 1920 he "had a search made," apparently in his department, and did not find this pamphlet or circular. There was no proof from the accounting department—to which the evidence brings these papers—either that they could not be found in the files or that the department head was ignorant of them. Upon the whole record, the strong probability is either that these papers reached and remained with the accounting department, or that they were filed away by some clerk in some more or less appropriate place in 1918, and by 1920 had been lost or misplaced or destroyed as old paper, or that they were not preserved at all. These alternative probabilities strongly overbalance the contingency that they were never delivered, when we also remember that they were never returned to the sender, and that two others sent by the same mails reached their destination.

Some of the leading cases discussing this question are cited in our opinion in Bloch v. Eastern Machine Screw Corporation, 281 Fed. 777, filed May 2, 1922. To them may be added the note in 49 L. R. A. (N. S.) 458. The Bloch Case well illustrates the varying rules of inference. The sole man to whom the letter would have come denied its receipt. He could hardly have forgotten it, and his immediate conduct was indicative of its nonreceipt. The bare inference of delivery arising from mailing was not strengthened by any corroborating circumstances. It was thought that the delivery was not established. In the present case the responsibility for knowing of the receipt and acting upon it was scattered to the point of vagueness. There is no proof of nondelivery from those subordinates most likely to have received it. There was strong corroboration. Appellee's immediate conduct in approving towing bills was consistent with its receipt. The burden is sufficiently met.

[4] The respect due to the concurrent findings of the master and the trial court cannot prevail over what we think the reasonably clear and fairly necessary inference from the proofs on an issue not depending at all upon the credibility of witnesses who were personally seen.

[5] It is not necessary to show that the tariff actually reached some officer of appellee who was authorized to contract on this subject. Responsibility cannot be avoided by showing that a written notice delivered by mail to a corporation's general office goes to the wrong department and stops there. The duty of the receiving department to communicate the notice seems obvious.

[6] Nor is any express assent by the appellee necessary to make a binding contract. If the tariff had been received, appellant had a right to assume that a request for towing was pursuant to the offer which had been made, and hence upon all conditions stated, and appellee may not deny that the conditions attached. To do so would be to mislead appellant.

[7] This brings us to the validity and effect of the restrictive provision. It is as follows:

"The rates for towing named herein are made upon the express condition that no claim for delay of any vessel served (whether due to repairs of damage or other causes) for which the Towing Company may be legally liable,

shall in any case exceed one hundred dollars ($100) per calendar day of such delay.

"Upon written notice from the owner, agent or master of any vessel, given before the towage service begins to the general office of the company at Cleveland, the above-mentioned limit of liability upon demurrage claims may be increased, in which event the regular tariff rates will be increased 5 per cent. of such rates for every one hundred dollars of increase in the limit of the Towing Company's liability for demurrage specified in such notice, but in no event shall such liability exceed the actual legal liability of the Towing Company for such demurrage. Nothing herein contained shall be construed to deprive the Towing Company of any legal defense it may have, whether by limitation of its liability under the federal statutes or otherwise."

This provision is substantially analogous to that customarily found in railroad tariffs, by which the rate is based upon the valuation, and which specifies, in effect, that, if the carriage is given at the regular rates, the carrier's liability will be limited to a specified amount, but that, if the shipper does not wish to be so limited, he may pay a higher rate, and secure a correspondingly higher liability. In one case the value of the goods carried, and in the other case the value of the use of the boat, both fixes the rate and measures the liability. Such provisions in the railroad tariffs are more open to objection on grounds of public policy than this one is in this towing contract, because common carriers by rail come much nearer to the position of insurers than does a tug giving towing services (see Ten Eyck v. Director General [C. C. A. 2] 267 Fed. 974); yet the validity of these rail tariff provisions is well established (Moore v. Duncan [C. C. A. 6] 237 Fed. 780, and cases cited on page 781, 150 C. C. A. 534).

Hence we conclude that the demurrage liability should be limited to $100 per day. The decree entered below will therefore be vacated, and the case remanded, for the entry of a decree modified in accordance with this opinion. The appellant will recover the costs of this court.