670 F.2d 61
 CANARCTIC SHIPPING COMPANY, LIMITED, as demise or bareboat
charterer and operator of the M/V Arctic,
Plaintiff-Appellant, Cross-Appellee,
v.
The GREAT LAKES TOWING COMPANY, owner and operator of the
tugs Tennessee and Pennsylvania,
Defendant-Appellee, Cross-Appellant.
 Nos. 80-3415, 80-3516.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 16, 1981.
Decided Jan. 28, 1982.
 
 John H. Hanninen, Ray, Robinson, Keenen & Hanninen, Gene B. George, William D. Carle, Cleveland, Ohio, for plaintiff-appellant, cross-appellee.
 William Jones Miller, Arter & Hadden, Robert McCreary, Cleveland, Ohio, for defendant-appellee, cross-appellant.
 Before EDWARDS, Chief Judge; MERRITT and MARTIN, Circuit Judges.
 PER CURIAM.
 
 
 1
 This admiralty appeal raises questions under the law of towage. The case arises from a collision on the Maumee River in Toledo, Ohio, which occurred when a ship under tow struck a bridge abutment. On June 13, 1978, the M/V Arctic, a Canadian flag, Arctic Class II bulk carrier, was on her maiden voyage from drydock at Port Weller, Canada to Toledo, Ohio. The Arctic crossed Lake Erie, sailing to Toledo harbor, where she was taken in tow by two tugboats owned by The Great Lakes Towing Company. With the tug Tennessee forward and the tug Pennsylvania aft, the flotilla travelled upriver to Anderson's grain elevator without mishap.
 
 
 2
 After the Arctic was loaded with cargo, the tugs towed her downriver to Lake Erie. As the flotilla approached the Cherry Street Bridge, the tugs allowed the Arctic to shift too far to port side, out of the Maumee's main dredged channel, and thus too close to the river's shallow westerly bank. The Arctic apparently touched bottom and was free neither to turn starboard, nor to come full ahead, as the tug captains ordered. The Arctic's captain, sensing danger, asked the tugs if he should back the engines. He never received an answer. Within moments, the Arctic's port bow struck the westerly bridge abutment, sustaining damage to her hull above the waterline.
 
 
 3
 Canarctic Shipping Company, as bareboat charterer of the Arctic, brought this libel in admiralty against the tugs' owners for damages and for eight days demurrage. After a bench trial, the District Court found that the tugs were entirely at fault, as the "dominant mind" of the tow. It also found that the tugs negligently failed to align the Arctic for safe passage through the narrow channel. Alternatively, the District Court held that the tugs breached an implied warranty to perform towage in a workmanlike manner. The court awarded $59,436.46 to Canarctic for damages sustained, but limited the demurrage claim-damages for the loss of the vessel's use-to the $1,000 daily rate specified in clause 8 of Great Lakes' General Tariff.
 
 
 4
 Canarctic now appeals, contending that it should not be bound by the demurrage limitation specified in the General Tariff. Great Lakes cross-appeals, contending that the District Court erred in: 1) finding that the tugs were solely at fault; and 2) applying breach of warranty theories to a cause of action sounding exclusively in tort. We address appellant's contentions separately.
 
 
 5
 Canarctic claims that it is entitled to $55,411.91, the full measure of damages resulting from loss of the Arctic's use. Canarctic challenges the demurrage limitation on public policy grounds, maintaining that exculpatory and limitations clauses should be disfavored because: 1) they fail to discourage negligence; and 2) they permit monopolists to abuse power. Canarctic asks us to overrule two early decisions in which this court approved similar tariff provisions, which limited claims against towing companies to a specified amount: Great Lakes Towing Co. v. Bethlehem Transp. Corp., 65 F.2d 543 (6th Cir. 1933); Hand & Johnson Tug Line v. Canada S.S. Lines, Ltd., 281 F. 779 (6th Cir. 1922). According to Canarctic, these cases are no longer valid under Bisso v. Inland Waterways Co., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), a case in which the Court invalidated an exculpatory clause in a towage contract. Finally, we are urged to follow the Seventh Circuit, which invalidated a Great Lakes' tariff limiting demurrage recovery to $100 per day in American Steamship Co. v. Great Lakes Towing Co., 333 F.2d 426, cert. denied, 379 U.S. 889, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964).
 
 
 6
 We agree with Great Lakes that Bisso does not invalidate all limitations on liability. As we read Bisso, that decision is much narrower than Canarctic's proposed interpretation. Bisso states that a towing company may not exempt itself from all liability for negligent towage. By contrast, Great Lakes' tariff merely limits in advance the amount of demurrage fees the company must pay in the event that it damages a ship through negligence. This tariff provision simply does not immunize Great Lakes from liability for its own negligence. In our view, a limitation on damages, unlike an exemption, does not induce or encourage negligence. A contractual ceiling on demurrage recovery is more akin to liquidated damages than to total exculpation from negligence. We therefore decline to follow the Seventh Circuit's view that Bisso should be extended to all contractual limitations on liability.
 
 
 7
 We also reject Canarctic's argument that the tariff provision is invalid because Great Lakes is in a position to drive a hard bargain. Nothing in the record hints at any inequality of bargaining power. Indeed, the Canadian government owns fifty-one percent of Canarctic. Nor do we find any basis in the record on which to assume that the Great Lakes tug industry is in concentrated ownership. We are not convinced by a 1914 antitrust consent decree that Great Lakes is the "only game in town" in 1981.
 
 
 8
 Furthermore, the record demonstrates that Canarctic had opportunities both to object to the demurrage limitation, and to pay an extra fee for additional coverage. The General Tariff was negotiated at the beginning of the towing season. Great Lakes sent copies of the General Tariff to all its customers. Canarctic, had it desired additional demurrage coverage, could have paid more and obtained unlimited coverage, at a cost of one percent of the regular rate for each additional $1,000 in coverage. The limitation provision specifically notifies tows that additional coverage is available to them by notifying Great Lakes in writing before towing services begin.
 
 
 9
 This court has recognized the validity of towage tariffs which give customers a fair opportunity to choose the amount of coverage. See, e.g. Hand & Johnson Tug Line v. Canada S.S. Lines, supra. In our view, it is unreasonable to place the burden on Great Lakes to ascertain in advance the needs of each customer for demurrage protection. Canarctic is in a better position to assess its own needs. We note that Canarctic never protested to Great Lakes about its tariff before accepting towing services. Canarctic simply chose to run the risk of less protection inherent in paying the lowest rate.
 
 
 10
 Because Canarctic has failed to carry its burden to show that Great Lakes did not offer its customers a choice of tariff rates, it is bound by its election of lower coverage. Petition of Isbrandtsen Co., Inc., 201 F.2d 281 (2d Cir. 1953). In our view, the demurrage limitation is just and reasonable, and was properly enforced. Midland Steamship Lines v. The Arkansas, 232 F.2d 81 (6th Cir. 1956).
 
 
 11
 We turn now to discuss Great Lakes' contentions. First, we dismiss the argument that the District Court erred in finding the tugs solely at fault. Our review of the findings of a district court sitting in admiralty is limited to the question whether they are clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954). Great Lakes argues that the Arctic's Master was at fault because he recognized the imminent danger to his ship, yet failed: 1) to warn the tugs of the Arctic's perilous position; or 2) to steer the Arctic to a safer position.
 
 
 12
 From our review of the record, we cannot say that any of the District Court's findings are clearly erroneous. Evidence showed that the Arctic's Master had never before traversed the portion of the Maumee above the Cherry Street bridge. The tugs and their captains, however, were familiar with the river channel. We find ample support for the District Court's finding that the tugs were the "dominant mind" of the tow. We also find support for the conclusion that the tugs were entirely responsible for the damages sustained by the Arctic.
 
 
 13
 Because we affirm the District Court's judgment on Canarctic's negligence claims, we do not address the merits of its alternative holding that Great Lakes breached a warranty of workmanlike service. Great Lakes contends that this alternative holding is erroneous and unsound as a matter of policy. In our view, that portion of the District Court's decision basing liability on contract theories is dictum and has no value as precedent. Great Lakes may well be correct in its contention that contract theories of liability would impose novel and unwarranted standards of care in towage relationships. However, we reserve judgment on that question.
 
 
 14
 Accordingly, we affirm the judgment of the District Court.