## G. W. McNear, Inc. vs. American & British Mfg. Co.

### JULY 10, 1919.

Present:  Parkhurst, C. J., Sweetland, Vincent, Stearns, and Rathbun, JJ.

*(1)  Combinations in Restraint of Trade.    Anti-Trust Act.*

Although a contract is to be performed in a particular State, yet if it is part of an illegal combination to secure control of a product and raise its price to all buyers in the United States, it is within the prohibition of the anti-trust act.

*(2)    Combinations in Restraint of Trade.    Conflicting Instructions in Charge.*

The issue in an action being whether or not the contract was part of a conspiracy between the parties to obtain a monopoly of a commodity and sell it at an unreasonable profit in violation of the common law, of the Sherman anti-trust act and of the statutes of the State, the court in one portion of the charge submitted to the jury the question of whether or not there was between the parties an illegal combination to create a monopoly; in another portion it took from them the issue of illegal combination by instructing them that there was no evidence of a conspiracy between the parties to restrain trade.

*Held*, that, in order to justify the finding of a conspiracy it is not necessary that the proof should be by direct evidence, but the jury may base such finding upon inferences fairly to be drawn from the facts and circumstances in evidence when such inferences amount to more than a conjecture and are of such a conclusive nature as to furnish the burden of proof required of the defendant in the case.

*Held*, further, that the issue of illegal combination should have been submitted to the jury, and the charge that there was no evidence of an illegal combination to create a monopoly constituted reversible error which was not cured by the contrary instructions in the general charge.

*(3)    Contracts in Restraint of Trade.*

The illegality in a contract in restraint of trade consists in the intent to establish a monopoly and to control prices and the plan of the parties for gathering in the profit is merely an unimportant detail.

*(4)   Conflicting Instructions.    Reversible Error.    New Trial.*

When contrary instructions are calculated to confuse and mislead a jury they constitute reversible error.    It cannot be left to the jury to reconcile conflicting statements of law and it is impossible for the appellate court to determine in accordance with which of two inconsistent statements their verdict has been reached.

*(5)   Contracts in Restraint of Trade.    Instructions to Jury.*

Instructions that the Anti-Trust Statute does not apply to an act between private parties unless the contract sued on itself contains provisions in violation of that statute and that "there are no provisions in the contracts in suit which violate any statute against restraints in trade and monopolies,"

took from the jury the issue of whether or not the contracts were invalid by reason of the provisions of the anti-trust act and constituted reversible error, for such contracts should be found to be illegal if they were entered into in furtherance of a combination which was itself illegal under the Act, although the contracts on their face contained no provision indicating such illegality.

*(6) Contracts in Restraint of Trade. Illegality as a Defence.*

Where the issue was whether or not the contract was part of a conspiracy between the parties to obtain a monopoly, refusal to charge that "if you find from the evidence that the contracts sued upon were entered into as a part of a scheme to artificially raise the price of quicksilver, then your verdict must be for the defendant" and "if the plaintiff knew the purpose for which the defendant was purchasing the quicksilver and that purpose was so to control the market that it could raise the price of quicksilver, the verdict must be for the defendant" was error, for courts will not enforce contracts tainted with illegality, and an illegal combination of which the contract was a part may be set up as a defence to its enforcement.

Vincent, J., dissents.

Assumpsit. Heard on exceptions of defendant and sustained.

Sweetland, J. This is an action in assumpsit brought by the plaintiff, a corporation organized under the laws of California, against the defendant, a corporation organized under the laws of New York and doing business in the city of Providence, to recover damages for the alleged breach of two contracts in writing, dated respectively January 28, 1916 and February 9, 1916.

The case was tried before a justice of the Superior Court sitting with a jury and resulted in a verdict for the plaintiff for $124,295.94, being the full amount of the plaintiff's claim with interest. The defendant duly filed its motion for new trial which was denied by said justice. The case is before us upon the defendant's exception to this action of said justice and upon certain exceptions taken by the defendant in the course of the trial.

The declaration alleges that on January 28, 1916, the plaintiff entered into a written contract with one Murray Innes by which it agreed to buy and said Innes agreed to sell 240 flasks of quicksilver at $275 a flask; and also that

on February 9, 1916, by another contract in writing the plaintiff agreed to buy and said Innes agreed to sell the full output of the "Oceanic" quicksilver mine owned by said Innes for six months from the date of the contract at $275 per flask. Said Innes reserved from said full output 25 flasks, sold to another concern, and the 240 flasks which were the subject of the contract of January 28, 1916. The declaration further alleges that by written agreements the plaintiff assigned said contracts to the defendant, which assumed them; that the defendant refused to accept or to pay for any of the flasks of quicksilver delivered under said contract; that the plaintiff has been obliged to receive and pay for them and has sold said flasks at auction at a loss of $111,606.93, which with interest was the amount of the verdict. The defendant in addition to the general issue set up a number of pleas in defence to the effect that said contracts, and the assignments of the same to it, were part of conspiracy between the plaintiff and itself to obtain a monopoly of quicksilver and sell it at an unreasonable profit in violation of the common law, of the statutes of California, and of the act of Congress known as the Sherman Act. The defendant also pleaded that the contracts sued upon were *ultra vires* the defendant.

It appears that the plaintiff was an old established concern of San Francisco carrying on extensively the business of a general shipping and commission merchant on the Pacific coast, handling merchandise in large quantities by carload and shipload lots, buying and selling on its own account and as agent for others, engaged in chartering cargo ships, "shipping to the Orient and Europe, merchandise of any kind," and having "a large grain warehouse in California.". The active managers are George W. McNear, Jr., and John A. McNear. The business was founded and built up by their father, G. W. McNear, Sr., and was incorporated in 1908. The finding is warranted that the transactions involved in the case before us were carried on for the plaintiff by John A. McNear, its Vice-President, and that on the part of the

defendant these transactions were conducted by its agent, Joseph H. Hoadley.

Quicksilver or mercury is used in making certain chemical and medicinal drugs, in the manufacture of certain kinds of paint, of thermometers and other articles, and much more extensively in the manufacture of fulminate of mercury. This latter substance is indispensable in the manufacture of cartridges and the primers of other ammunition. With the beginning of the late war the demand for quicksilver increased. Its production in this country was chiefly in California, some was produced in Texas and small quantities in other western states. Outside of this country the chief sources of supply were from mines in Spain and Austria. The war closed the Austrian mines to the world outside the Central European powers. The British controlled the output of the Spanish mines and had placed an embargo upon the exportation of quicksilver from Great Britain. Quicksilver is sold on the market, contained in iron cases about twelve inches high with a screw stopper. Each case contains seventy-five pounds of quicksilver. These cases are called flasks and the market price is fixed per flask.

John A. McNear met Joseph H. Hoadley in New York in December, 1916. Mr. and Mrs. Hoadley entertained Mr. and Mrs. McNear at dinner one evening and during that entertainment, as the plaintiff claims, Mr. Hoadley intentionally "planted" in the mind of Mr. McNear that he had intimate relations with some body of men which he called indefinitely the Russian syndicate. Throughout the testimony reference is made to this group as the "Russians," the "Russian syndicate" and the "Russian representatives." After the return of Mr. McNear to California, on January 6, 1916, he received the following telegram from Mr. Hoadley in New York : "Put yourself in touch with controlling interests to purchase output for 1916 of quicksilver of following producers act quick wire fully 18 East Eighty Second Street will care for your interests want number of flasks price and monthly deliveries get ten days to accept New

Idria Mines San Benito County New Almaden and Guadaloupe Santa Clara Oceanic San Luis Obispo St. John Solano Oathill Napa Mercy Fresno Great Western Lake County Parkfield Monterey Wondeer Hernadez San Benito Cambria Karl San Luis Obispo Los Prietes Santa Barbara Phœnix Santa Clara Great Eastern Sonora Reed Colo." Mr. McNear immediately began the study of the whole quicksilver situation, acted as he was requested in the telegram of January 6, and reported to Mr. Hoadley. He found that the yearly output of quicksilver in this country was between 18,000 and 20,000 flasks; that the largest source of supply was California which produced about 15,000 or 16,000 flasks per year; and that the list of mines mentioned in the telegram of January 6, 1916, embraced about all the large producers of quicksilver. Following the telegram of January 6, 1916, there were a large number of communications between Mr. McNear and Mr. Hoadley in regard to securing control of the output of various mines for 1916. These communications were almost daily, to some extent they were by letter but largely by means of telegrams and by conversations over the telephone. On January 6, 1916, the market price of quicksilver was about $150. per flask. The price rose rapidly thereafter until it reached $275. and $300. per flask between January 26 and February 15. As a result of the negotiations of Mr. McNear, the plaintiff procured an agreement for the sale to the defendant of the total output of the New Idria mine, the largest producer in California. Its estimated production was 7,500 flasks per year with a possible output of 10,000 flasks per year. This contract, however, did not become effective through the failure of the defendant later to furnish the required guaranty of performance. Mr. McNear also negotiated with the owners of other mines and progress was made toward securing options upon the output of a number of smaller mines. Mr. McNear through his dealings with Mr. Murray Innes obtained the contracts which are involved in this suit for the product of the Oceanic mine, the third largest producer in California. Mr. Innes

refused to execute these contracts with the defendant without a satisfactory guaranty that the contracts would be kept by the defendant. After a series of promises on the part of the defendant to furnish a satisfactory guarantor, which promises it did not keep, in order to prevent a failure of the negotiations the plaintiff took the contracts in its own name and was allowed a rebate or concession on the price of the quicksilver by Mr. Innes. According to the testimony the facts relating to the rebate were communicated to the defendant and approved by its agent Mr. Hoadley. The defendant received assignments of these contracts and assumed the obligation of receiving the quicksilver from the seller and paying for the same. According to the testimony soon after this time, upon the urgent request of certain large manufacturers of ammunition who were users of fulminate of mercury, the British government permitted two shipments of quicksilver to be made to this country of about 2,000 and 1,000 flasks, respectively. These shipments resulted in bringing about a rapid decline in the market price of quicksilver which in the month of August, 1916, reached $68 per flask. For the rest of 1916 the price fluctuated between $70. and $80. per flask. The defendant failed to keep its agreements named in the assignments of said contracts and the plaintiff was obliged to receive and pay for the output of the Oceanic mine as delivered, which quicksilver it afterwards sold at a loss.

The principal issue between the parties at the trial was that raised by the defendant's plea, that said contracts were entered into by the plaintiff and the defendant in furtherance of an illegal combination to acquire all or a large part of the quicksilver production for the year 1916, for the purpose of creating a monopoly therein, thus acquiring the power to control the price of that commodity, with the intention of enhancing its price to their own profit and to the detriment of the public. If the effect of the monopoly aimed at by such combination or conspiracy would be to check or to hinder the natural free flow of trade and com-

merce between the states it would be in violation of the act of Congress known as the Sherman Act. *United States* v. *Reading Co.*, 183 Fed. 427; *Addyston Pipe and Steel Co.* v. *U. S.*, 175 U. S. 211. The Sherman Act provides as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations is hereby declared to be illegal." The contracts sued upon were to be performed in California yet if the contention of the defendant is established, that they were part of an illegal combination to secure control of the product and raise the price of quicksilver to all buyers in the United States, such contracts are within the prohibition of the Anti-Trust Act. *Loewe* v. *Lawlor*, 208 U. S. 274; *United States* v. *Reading Co.*, 226 U. S. 324.

As to the issue of illegality it is the contention of the plaintiff that the transactions between these parties, with reference to the purchase of the 1916 output of quicksilver, were of such a nature that the only inference properly to be drawn from them is that the plaintiff was unaware of any illegal purpose on the part of the defendant; that if the defendant had such illegal intent the plaintiff was not a party to it or combined with the defendant to promote it; that the acts and purposes of the plaintiff were plainly those of an agent arranging for the purchase of a commodity on behalf of a principal who is seeking to supply the legitimate requirements of a ready customer or customers, viz., the Russian government and perhaps the Canadian government. It is the contention of the defendant that the evidence warranted the finding, and that the jury should have found, that the purpose of the defendant was to create an illegal monopoly in quicksilver; that the plaintiff was well aware of such purpose and combined with the defendant to promote it with the expectation of sharing in the profits which should accrue from its successful accomplishment.

In his general charge to the jury said justice, after calling to their attention the defendant's claim of a conspiracy between the plaintiff and the defendant and after instructing the jury as to what constituted a conspiracy, and as to the right of an owner of property to fix the price at which he will sell the same, continued as follows: "but there must be a combination between two or more persons in order to have a conspiracy, and so you take the testimony relating to the communications from Hoadley to McNear and from McNear to Hoadley and determine from the evidence whether or not there was a conspiracy between them in view of what happened between these gentlemen and the American & British Company." At the request of the defendant said justice charged the jury, reading from the defendant's first request, as follows: "1. If you find from the evidence that the plaintiff and defendant conspired to create a corner in quicksilver, then your verdict must be for the defendant." Later, upon the request of the plaintiff, he instructed the jury as follows, reading to them from the plaintiff's third request to charge: "3. That there is no evidence in the case that the plaintiff knew of or had any scheme to monopolize quicksilver and that if Joseph H. Hoadley or the defendant had any such scheme in his mind which was illegal, which was not communicated to the plaintiff's agent, such illegal scheme in the mind of Hoadley could not be imputed to the plaintiff, the McNear Company." And further instructed them, reading from the plaintiff's twenty-third request to charge: "23. There is no evidence of any conspiracy or agreement between the plaintiff and the defendant to control or fix prices or to restrain trade." Later, upon his own motion, the court instructed the jury as follows: "I think, Gentlemen, I have covered the provisions of the law relating to this case and now it is for you to take the case and consider the evidence under the law as stated to you by the Court, and if you come to the conclusion that the defendant has not shown by a fair preponderance of the evidence that there was a contract or that

these contracts were made in conspiracy for the purpose of advancing the price of quicksilver on account of the defendant and the plaintiff obtaining a monopoly on it, or that the contracts were not in contravention of the Statute Laws of the United States, the Sherman Act or the laws of the State of California, why you will return a verdict for the plaintiff for the sum stated in the amended Bill of Particulars which has been filed as evidence in this case." Still later, after an inquiry from counsel for the defendant the justice instructed the jury as follows: "All the requests to charge which I have read to you, both for the plaintiff and for the defendant, are granted as read to you."

(2)    We have given very careful consideration to these instructions and they appear to us to be without doubt contradictory and misleading. In one portion of his charge he submits to the determination of the jury the question of whether or not under the evidence there was between the parties an illegal combination to create a monopoly and restrain trade; in another portion he takes from them the issue of illegal combination by instructing them that there was no evidence of a conspiracy between the parties to fix prices or to restrain trade. If in fact there was no legal evidence in the case which warranted the finding of a conspiracy, then although the charge was contradictory the defendant has not been prejudiced thereby and it would only appear that some portion of the instructions was more favorable to the defendant's claim than the evidence would justify. We think, however, that the issue of illegal combination should have been submitted to the jury. In order to justify the finding of a conspiracy it is not necessary that the proof should be by direct evidence. The jury may base such finding upon inferences fairly to be drawn from the facts and circumstances in evidence, when such inferences amount to more than a conjecture and are of such a conclusive nature as to furnish the burden of proof required of the defendant in this case.

In *Marrash* v. *United States*, 168 Fed. 225, the court said, at page 229 : "It is argued that there was no direct evidence of conspiracy and the circumstantial evidence was insufficient to warrant a conviction. . . . It is not necessary to establish the conspiracy by direct evidence. Conspirators do not go out upon the public highways and proclaim their purpose; their methods are devious, hidden; secret and clandestine. It is enough that they have a common purpose to defraud and that they act together for that purpose.

"It is not necessary that a formal agreement be proved; it is sufficient if the testimony shows that the parties are acting together understandingly to accomplish the same unlawful purpose, even though individual conspirators may do acts in furtherance of the common unlawful design apart from and unknown to the others. It is manifest, therefore, that in many and, indeed, in most cases of conspiracy the corrupt agreement is proved by circumstantial evidence." *Alaska S. S. Co.* v. *International Longshoreman's Ass'n.*, 236 Fed. 964; *United States* v. *Keitel*, 211 U. S. 370; *United States* v. *Newton*, 52 Fed. 275; *In Re Friedman*, 164 Fed. 131.

Different minds might reach different conclusions as to the inferences reasonably and fairly to be drawn from the evidence, but it is clear to us that it cannot be said as a matter of law that there was no legal evidence before the jury upon which they could find a conspiracy to obtain an illegal monopoly with the intent to restrain trade. The plaintiff has urged that Mr. McNear was flattered by the social attentions paid to him by Mr. Hoadley during the former's visit to New York and that in some way by what is termed the "glamour" of Mr. Hoadley's personality he was deprived of the power of understanding Mr. Hoadley's purposes. If such influence should be found to exist the inference might not appear unreasonable to some minds that for this reason Mr. McNear might be more readily inclined to follow the lead of Mr. Hoadley and to have confidence in the ultimate success of his schemes. Mr.

McNear appears to have been a man of long experience in large affairs. He entered actively into the business of his father in 1882; for a number of years he had charge of the Liverpool office of the concern. From all the testimony it might be found that his business experience had been as great as that of Mr. Hoadley, and that he undoubtedly had knowledge of the methods of speculation, the nature of "corners," the power to enhance prices which comes from the complete or partial control of a commodity the demand for which is greater than the supply, and that he was familiar with the means usually employed to acquire such control of a commodity and thus to obtain the unreasonable profit which such control made possible. If found to be a man of that experience and knowledge it would not be unreasonable to ascribe to him an understanding of the probable purport of many of the circumstances of this transaction. There can be no question that he undertook to assist the defendant in obtaining as far as possible control of all the quicksilver production for 1916 in California and that he was informed that Mr. Hoadley desired to acquire control of that produced in other states. It is urged that he supposed that the control was for the legitimate purpose of supplying the need of the Russian government. There is evidence from which it might be found that this was not so, and that Mr. McNear had ample notice by telegrams and telephone communications from Mr. Hoadley that the latter had no contract, agreement or understanding with any representatives of the Russian government; but that without success he was actively engaged in trying to obtain some agreement whereby he might sell to such representatives the quicksilver over which he had acquired control at the greatly advanced prices which his manipulations had produced; and it might be found that it was from the Russians, equally with the others who might need quicksilver, that the defendant was looking to obtain the great and unreasonable profit which would arise from a complete or partial control of the limited supply of that commodity. It is obvious that the profits of

such an illegal monopoly as is alleged can only be secured by disposing of the commodity acquired at the enhanced price which the monopolist is in a position to demand. Such prices can be obtained, if at all, from those whose necessity compels them to purchase. It is represented that the Russians were in great need of quicksilver; they might be regarded as the readiest and most convenient victims; but the scheme, if it existed, is no less in restraint of trade and illegal because its authors hoped to receive a large part of their unreasonable profit from the Russians rather than from the thermometer or medicine manufacturers or the American makers of ammunition. The illegality consists in the intent to establish a monopoly and to control prices. (3) The conspirator's plan for gathering in the profit, in the contemplation of law, is merely an unimportant detail. It appeared that New York is the market for quicksilver and that market fixes the price throughout the country. It was in evidence that while Mr. McNear was working in California to obtain control of the supply Mr. Hoadley within the knowledge of Mr. McNear was endeavoring to sustain the price of the commodity in New York and it might be found that his acts were inconsistent with those of an agent who in good faith was endeavoring to purchase in order to supply the legitimate needs of a ready customer. In one of his telegrams to Mr. McNear, Mr. Hoadley said, referring to his own actions in New York, "Can stop purchasing if advisable but wish to sustain price unless it interferes with your work to control product." Mr. Hoadley kept Mr. McNear informed as to his success in securing all "spot," or quicksilver that was on the New York market. Mr. McNear in one of his letters says : "With the position I have put you in on the New Idria contract and the Oceanic and with the new Almaden tied up as you say it strikes me that you hold a very strong position, in fact, that you have the matters in your hands." On February 26, 1916, he telegraphed as follows to Mr. Hoadley: "Wire me confidentially without fail how matters stand. Inside reports

here very unfavorable to market. Have done my part for you and if something goes wrong you should give me inside information to protect my position." In explanation of this telegram he testified that the unfavorable inside reports to which he referred were that "the market was weak." To this telegram Mr. Hoadley replied, "Answering. Learned that great activity of strong interest to induce foreign importations so prefer a market weak at present. All matters going to entire satisfaction. Have closed with St. John Mining Company same basis as Idria." It was soon after this that the two British shipments were made to this country. Mr. McNear also testified that at one time Mr. Hoadley sent him a wire that he was putting the price up. "He didn't tell me what for and I didn't ask him." Mr. McNear also testified as follows : "774 Q. Did you and Mr. Hoadley talk over what you expected to be the condition of the market in consequence of these purchases that you made ? A. Why, Hoadley came through and telephoned several times, one or two times anyway, with very flighty ideas. 745 Q. How high did he tell you he expected the market to go ? A. I think he got as high as 500 or 600." Mr. McNear also testified with reference to his compensation as follows: "555 Q. What did you expect to get for your services in this matter ? A. Relying upon Hoadley's first wire, I never knew exactly what I would get but something very substantial from his promises to me. In fact, the satisfaction he had expressed for what I had done in getting the New Idria contract, I asked what I was to get out of it and he says, 'leave it to me. You will be very well treated.' So I expected more than the ordinary commission."

There are other facts and circumstances appearing in the correspondence between the parties from all of which a jury might with reason conclude that a conspiracy existed between these parties; there are other circumstances which some minds might regard as strongly supporting the contention of the plaintiff. The case was one requiring a submission of the issues to a jury upon the conflicting evidence.

In our opinion the instruction to the jury which the court gave in response to the plaintiff's third and twenty-third requests, quoted above, constitute reversible error, and the error is not cured by the contrary instructions in the judge's general charge.   This court has recently considered the case of *Greenhalch* v. *Barber*, reported in 104 Atl. 769.   In that case in the Superior Court the trial justice had at different points in his charge instructed the jury as to the care required of the driver of an automobile in the circumstances of the case.   In one portion of his charge he had given to the jury a proper statement of the law in that regard and in another portion his instruction as to the driver's duty was erroneous.   The court held that these conflicting and confusing instructions constituted error and entitled the defendant to a reversal and a new trial.   This is in accord with the established doctrine that when contradictory instructions are calculated to confuse and mislead the jury they constitute reversible error.   It cannot be left to the jury to reconcile the conflicting statements of law; and it is impossible for the appellate court to determine in accordance with which of two inconsistent statements their verdict has been reached.

(4)

Upon the plaintiff's fifth and sixth requests to charge the justice instructed the jury as follows :   "5. That the federal statute does not apply to an act between private parties unless the contract sued on itself contains provisions in violation of that statute.   6. That there are no provisions in the contracts in suit which violate any statute against restraints in trade and monopolies."   By these instructions the justice took from the consideration of the jury the issue of whether or not said contracts were invalid by reason of the provisions of the Anti-Trust Act.   The instruction thus given was reversible error.   Such contracts should be found to be illegal if they were entered into in furtherance of a combination which was itself illegal under the provisions of the act, although the contracts on their face contain no provision indicating such illegality.   In *U. S.* v. *Reading Co.*,

(5)

226 U. S. 324, the court said: "It is not essential that these contracts considered singly be unlawful as in restraint of trade. So considered they may be wholly innocent. Even acts absolutely lawful may be steps in a criminal plot. . But a series of such contracts if the result of a concerted plan or plot between the defendants to thereby secure control of the sale of the independent coal in the markets of other states and thereby suppress competition in prices between their own output and that of the independent operators would come plainly within the terms of the statute and as parts of the scheme or plot would be unlawful." In *Darius Cole Transportation Co.* v. *White Star Line,* 186 Fed. 63, the court said: "The federal anti-trust law forbids every contract, combination or conspiracy which directly or necessarily operates in restraint of trade between the states without regard to the form which the transaction takes. Can it make any difference with the result that the lessor did not propose the insertion of stipulations against competition if he knew that the object of the lessee was to effect a continuance of the monopoly which had been maintained by the participation of the parties up to that time and that such would be its effect and approved of such result knowing that it, as lessor, was receiving a rental which could only be paid because of the securing of such monopoly." *Bigelow* v. *Calumet & Hecla Mining Co.,* 167 Fed, 721; *Continental Wall Paper Co.* v. *Louis Voight,* 212 U. S. 227; *Bement* v. *National Harrow Co.,* 186 U. S. 70.

(6)    The refusal of said justice to charge the jury in accordance with the defendant's seventh and eighth requests to charge was error. These requests are as follows:

7.    "If you find from the evidence that the contracts sued upon were entered into as a part of a scheme to artificially raise the price of quicksilver then your verdict must be for the defendant."

8.    "If the plaintiff through John McNear knew the purpose for which Hoadley or the defendant was purchasing the quicksilver and that purpose was so to control the market

that it could raise the price of quicksilver the verdict must be for the defendant." (Tr. p. 856.)

These requests are correct statements of the law. The plaintiff contends that individuals can not set up the Sherman Act as a defense against such contracts as are here sued upon. That contention is unsound. Courts will not enforce contracts which are tainted with illegality. In *Continental Wall Paper Company* v. *Voight and Sons Co.*, 212 U. S. 227, the court said : "In such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties. It is of no consequence that the present defendant company had knowledge of the alleged illegal combination and its plans, or was directly or indirectly a party thereto. Its interest must be put out of view altogether when it is sought to have the assistance of the court in accomplishing ends forbidden by the law." *McMullen* v. *Hoffman*, 174 U. S. 639; *Bement* v. *National Harrow Company*, 186 U. S. 70; *Oscanyan* v. *Arms Company*, 103 U. S. 261. The plaintiff claims that its position in this regard is supported by *Wilder* v. *Corn Products Refining Company*, 236 U. S. 165. That case is not in point and its language does not justify the plaintiff's conclusion that the United States Supreme Court after some uncertainty as to its position has in the *Wilder* case finally decided that individuals could not set up the act as a defense against such contracts as are here sued upon. As we have said above the question should have been submitted to the jury as to whether there was an illegal conspiracy between these parties to create a monopoly and to restrain trade contrary to the provisions of the Sherman Act. If it should be found that there was, then the contracts sued upon were clearly in furtherance of that conspiracy, and the illegality by reason of the violation of the Federal statute is inherent in the contracts. The United States Supreme Court has never indicated any uncertainty in its position that in such circumstances the illegal combination, of which such con-

tract was a part, might be set up as a defense to its enforcement, although the illegal scheme did not appear in any of its provisions. And in *Wilder* v. *Corn Products Co.* that position of the court was plainly set forth. That case is authority for the proposition, stated in its headnote, that "a party cannot assert as a defense to a suit for money otherwise due under a contract, not inherently illegal, the fact that the party otherwise admittedly entitled to recover is an illegal combination under the Anti-Trust Act."

The defendant has included in its bill of exceptions about three hundred which relate to rulings of said justice made in the course of the trial upon the admission and exclusion of testimony. We have examined them. Most of them are upon the refusal of said justice to permit the defendant to ask certain questions in cross-examination of the plaintiff's witnesses. In many instances we are of the opinion that there is merit in the exception, but none of them relate to matters which are vital in the case, and in view of our determination upon other exceptions, we will not extend the opinion by a discussion of this large number of rulings. They all relate to rather elementary principles with regard to the latitude properly allowed in the cross-examination of witnesses; they indicate that in a number of instances the defendant was unduly restricted in such examination.

All exceptions which relate to the defendant's claim that the contracts of the defendant were *ultra vires* are overruled. The powers given to the defendant by its charter are clearly broad enough to authorize the making of such contracts.

The exceptions which concern the defendant's claims that said contracts are not enforceable against the defendant because the forms of guaranty attached thereto were not executed are without merit.

The testimony of Joseph H. Hoadley given at a former trial, in the circumstances appearing in the transcript was properly excluded.

We are of the opinion that the defendant's exceptions should not be sustained to the judge's rulings excluding the

declarations of Hoadley to the witness Beach and evidence as to the acts of Hoadley at the time of the formation of the Mercury Products Company. The defendant urges that after the introduction of evidence of a conspiracy the acts and declarations of each conspirator in pursuance of its objects are admissible against all. We have already indicated that in our opinion there was sufficient circumstantial evidence of conspiracy to require the submission of the question of its existence to the jury. We think, however, that in the state of the proof and the uncertainty as to the connection of the declarations and the acts in question to the conspiracy alleged in this case, said justice was acting well within his discretion in excluding such testimony from the jury.

As to the defendant's exceptions to rulings relating to the alleged bad faith of the plaintiff in receiving rebates on the price of the quicksilver which is the subject of the contracts sued upon, it is the uncontradicted testimony that full disclosure was made by the plaintiff's agent to the defendant's agent with regard to these rebates. The allegations of bad faith are unsupported.

The justice's rulings with regard to the admission of evidence of damages accruing subsequent to the date of the writ are without error as are his rulings as to the allowance of interest in case the plaintiff should be permitted to recover the principal of its claim.

The defendant's exceptions numbered 239, 240, 254, 256, 257 and 274 in its bill of exceptions are sustained; all of its other exceptions are overruled.

The case is remitted to the Superior Court for a new trial.

VINCENT, J., dissenting. I am unable to agree with the majority of the court in sustaining the exceptions of the defendant numbered 239, 240, 254, 256, 257 and 274.

While the defendant's requests to charge, covered by exceptions numbered 239 and 240, embrace substantially correct statements of the law they had been fully covered

in the charge already given and the court was not in error in refusing to give them undue prominence through repetition.

The remaining four exceptions relating to portions of the charge given upon the requests of the plaintiff, numbered 3, 5, 6 and 23, I will discuss briefly.

The third request is, "That there is no evidence in the case that the plaintiff knew of or had any scheme to monopolize quicksilver and that if Joseph H. Hoadley or the defendant had any such scheme in his mind which was illegal, which was not communicated to the plaintiff's agent such illegal scheme in the mind of Hoadley could not be imputed to the plaintiff, the McNear Company."

The twenty-third request is, "There is no evidence of any conspiracy or agreement between the plaintiff and defendant to control or fix prices or to restrain trade."

The defendant argues that the charge of the third request took from the jury the question whether the plaintiff knew of or had any scheme to monopolize quicksilver and that the charge of the twenty-third request was virtually telling the jury to find for the plaintiff upon the question of the restraint of trade and that these requests as charged were inconsistent with, and contradictory of, another portion of the charge which is, "And so you take the testimony relating to the communications from Hoadley to McNear and from McNear to Hoadley and determine from the evidence whether or not there was a conspiracy between them in view of what happened between these gentlemen and the American and British Company."

The two portions of the charge covered by the third and twenty-third requests may be considered separately. Taking the first part of the third request, "That there is no evidence in the case that the plaintiff knew of or had any scheme to monopolize quicksilver" there is certainly no evidence that the plaintiff had originated or adopted any such scheme. The defendant says that the plaintiff knew of such a scheme and in substantiation of that statement makes

reference to the testimony of John F. McNear that he knew Hoadley was trying to buy up all the output and that he was doing all in his power to help him. To treat this testimony fairly it must be considered in connection with other testimony in the case. In the first place the purchase of or the attempt to purchase the entire output of the California mines could not be considered as an attempt to obtain a monopoly in restraint of trade and for the purpose of unduly enhancing prices if the object of the purchase was legitimate. This admission of McNear that he was trying to help Hoadley buy up the California output, in view of other undisputed facts, cannot be characterized as evidence showing knowledge on the part of McNear that Hoadley was engaged in conducting an illegal enterprise and there was no evidence that McNear participated in or had any knowledge of any plan on the part of Hoadley to fix the selling price of quicksilver at a figure which would operate as a restraint of trade.

The object of Hoadley as it was again and again brought to the attention of McNear was to obtain quicksilver for the Russian and Canadian governments and the quantity which Hoadley contemplated acquiring for that purpose was within the limits of their reasonable requirements. To say, as the defendant does, in substance, that because McNear knew that Hoadley was trying to get the California output he must have known that it was for an illegal purpose, is assuming something which the testimony does not warrant. I think the trial court was correct in saying that there was no evidence that the plaintiff knew that Hoadley was trying to create a monopoly for illegal purposes.

As to the latter part of the third request it is unnecessary to argue that any illegal scheme in the mind of Hoadley which was not communicated to the plaintiff or to its agent John F. McNear could not be imputed to the plaintiff. The defendant also further argues that the latter portion of the third request took away from the jury any consideration as to whether it might be inferred from facts and circumstances that the plaintiff's agent knew of an illegal scheme

although Hoadley had not directly communicated it. This question however was distinctly left to the jury as I shall have occasion to point out later.

The meaning of the twenty-third request seems to me to be clear. Conspiracy has been defined to be a combination of persons for an evil purpose; an agreement between two or more persons to commit in concert some reprehensible, injurious or illegal act. There was no evidence of any such agreement between the plaintiff and the defendant. The court had already pointed out to the jury that the plaintiff and defendant were both corporations and that they could only act through authorized agents. The language of the court that there was no evidence of any conspiracy or agreement to fix prices, etc., between the plaintiff and defendant was strictly correct. That the court was referring to the parties as corporations is obvious. That such was the meaning of the court is clearly evidenced by a later portion of the charge in which the court submitted to the jury the question, "Was there an agreement between the plaintiff and the defendant, these two corporations, acting through their respective agents to do an unlawful act" and further on the court charged the jury to "take the testimony relating to the communications from Hoadley to McNear and from McNear to Hoadley and determine from the evidence whether or not there was a conspiracy between them in view of what happened between these gentlemen and the American & British Company."

Again the court said, "it is for you gentlemen to determine if there was a conspiracy between the McNear Company and the American & British Company for that purpose and in violation of the law."

Still later the court said, "If you find from the evidence that Joseph H. Hoadley and John A. McNear conspired to artificially raise the price of quicksilver in this country or any state thereof, and the contracts sued upon were executed in furtherance of such conspiracy, then your verdict must be for the defendant."

And finally the court said, "it is for you gentlemen to consider the evidence relating to those matters and to the excuse offered by the defendant, and, if the defendant shows by a fair preponderance of the evidence that it was justified in repudiating the contracts and in not going on with them or with either of them or both of them, then your verdict would be for the defendant."

So far as appears the only authority which was vested in Hoadley by the defendant was the negotiation of the contracts of January 28 and February 9 and the only evidence that the defendant conferred that authority is its acceptance of the transfer and its undertaking to assume all liabilities of the plaintiff thereunder which it later repudiated.

There is no inconsistency between these two requests, numbered three and twenty-three, and that portion of the charge wherein the court instructed the jury to take the testimony relating to the communications from Hoadley to McNear and from McNear to Hoadley and determine from the evidence whether or not there was a conspiracy between them, in view of what happened between these gentlemen and the American & British Company.

From the reading of the charge as a whole it is apparent that the trial court sought to distinguish between a conspiracy evidenced by an actual agreement between the parties and a conspiracy which might be inferred from their relations evidenced by the letters, telegrams and telephonic conversations which passed between Hoadley and McNear and to bring to the minds of the jury the precise question which, under the testimony, it was their province to decide, that is, Did the communications which passed between McNear and Hoadley show a conspiracy between the plaintiff and the defendant?

It must be remembered that these contracts were entered into between the plaintiff and defendant and not between the plaintiff and Hoadley. There is absolutely no direct evidence that the plaintiff and defendant conspired together and there is no direct evidence that Hoadley was endeavor-

ing to set up a conspiracy at the instigation of the defendant, with its knowledge or for its benefit. If there was such a conspiracy it must be determined by way of inference from facts and circumstances connected with the transactions carried on between McNear and Hoadley. The trial court in submitting the case to the jury explicitly stated to them no less than four times that the question of conspiracy must in determined by them after considering the testimony relating to the communications between McNear and Hoadley.

This instruction having been repeatedly given to the jury with such distinctness, I cannot see how any doubt or confusion could have arisen in their minds as to whether the question of conspiracy was left to them. There is nothing in the record suggesting that any such doubt or confusion existed and there was sufficient testimony upon which the jury might find the verdict which it did.

The majority opinion finds reversible error in that portion of the charge of the trial court relating to the Sherman Act. Assuming that the view expressed by the court was an erroneous one, it was harmless error under the circumstances of the case. As before stated the question of conspiracy, as evidenced by the various communications between Hoadley and McNear, was submitted to the jury and upon consideration of the evidence the jury found that there was no conspiracy. If there was no conspiracy then there could have been none under the Sherman Act and the exclusion of that Act from the jury would not be prejudicial to the defendant. The jury were left free to find conspiracy at common law or under the laws of California if, in their judgment, the evidence warranted such finding.

I think that the exceptions which the majority opinion sustains should be overruled and that the case should be remitted for judgment for the plaintiff on the verdict.

*Charles F. Choate, Jr., Frank T. Easton, Greenough, Easton & Cross,* for plaintiff.

*Waterman & Greenlaw,* for defendant.