DARIUS COLE TRANSP. CO. v. WHITE STAR LINE.

(Circuit Court of Appeals, Sixth Circuit. March 7, 1911.)

No. 2,048.

1. MONOPOLIES (§ 12*)—FEDERAL ANTI-TRUST ACT—CONSTRUCTION AND SCOPE.

The sale of a business and the good will pertaining to it, and an agreement, within reasonable limitations as to time and territory, not to enter into competition with the purchaser, when made as a part of the sale of the business, and not as a device to control commerce, is not within the federal anti-trust law of July 2, 1890 (chapter 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), but such act renders unlawful every contract combination or conspiracy which directly or necessarily operates in restraint of trade between the states without regard to the form which the transaction takes.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

---

2. MONOPOLIES (§ 16*) — FEDERAL ANTI-TRUST ACT — ILLEGAL CONTRACTS — LEASE OF VESSEL.

Libelant and respondent were both owners of steamers running regularly between Detroit and Toledo, and for a number of years had operated under a pooling arrangement which gave them a monopoly. At the expiration of such arrangement, libelant sold one of its boats and leased the other to respondent for a term of three years to be run between such two points, and at the same time transferred its good will, and agreed not to engage in competition during the term. The rental reserved was more than the steamer could have earned operated independently. Held, on the evidence, that the dominant purpose of the parties was to enable respondent to maintain its monopoly of the business, and that the lease was void as in violation of Sherman Anti-Trust Law July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), and rent could not be recovered thereon.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

Severens, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Michigan.

Suit in admiralty by the Darius Cole Transportation Company against the White Star Line. Decree for respondent, and libelant appeals. Affirmed.

F. C. Harvey (J. J. Speed, of counsel), for appellant.
Gray & Gray, for appellee.

Before SEVERENS, WARRINGTON, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This is an appeal from a decree dismissing the libel filed by appellant for the recovery of two installments of rent upon a lease of the steamer Idlewild; the decree being based upon the ground that the contract of lease was void as being in restraint of trade under the Sherman anti-trust law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). The lease was made March 8, 1900, for a term of three years, at an annual rental of $13,000, with a provision for the substitution (without additional rental), during a portion of the season, of the steamer Arundell, owned by appellant, and then engaged during a short season in navigating Lake Ontario, and with further provision for the use of the Arundell by appellee (in connection with the Idlewild) for another portion of the season, at the option of appellant at an added rental. The Idlewild was to be run "as a passenger and packet freight steamboat between Port Huron and Detroit, Michigan, and Toledo, Ohio, and upon any portion of said route," and in connection with the lessee's "other steamers in the passenger and packet freight business on the river and lakes between Port Huron, Michigan, and Toledo, Ohio." By the eleventh paragraph of the charter the lessor "agrees to surrender to the party of the second part all of the good will of the 'river business,' so-called, that may be controlled by it, and to that end agrees not to enter into competition with the party of the second part upon the routes herein named, and not to operate any of its vessels or any vessel

whatsoever on the said routes between Detroit and Port Huron or between Detroit and Toledo during the period of the said three years."

[1] It is well settled that the sale of a business, and the surrender of the good will pertaining to that business, and an agreement thereunder, within reasonable limitations as to time and territory, not to enter into competition with the purchaser, when made as part of the sale of the business, and not as a device to control commerce, is not within the federal anti-trust law. United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 329, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Ass'n, 171 U. S. 505, 568, 19 Sup. Ct. 25, 43 L. Ed. 259; Bement v. National Harrow Co., 186 U. S. 70, 92, 22 Sup. Ct. 747, 46 L. Ed. 1058; Cincinnati Packet Co. v. Bay, 200 U. S. 179, 185, 26 Sup. Ct. 208, 50 L. Ed. 428; Fisheries Co. v. Lennen (C. C.) 116 Fed. 217; Davis v. A. Booth & Co. (6th Circuit) 131 Fed. 31, 65 C. C. A. 269.

On the other hand, it is equally well settled that the federal anti-trust law forbids every contract, combination, or conspiracy which directly or necessarily operates in restraint of trade between the states without regard to the form which the transaction takes. Northern Securities Co. v. United States, 193 U. S. 197, 331, 24 Sup. Ct. 436, 48 L. Ed. 299; Chesapeake & Ohio Fuel Co. v. United States, 115 Fed. 610, 619, 620, 53 C. C. A. 256, 265, 266; Clark v. Needham, 125 Mich. 84, 85, 87, 83 N. W. 1027, 51 L. R. A. 785, 84 Am. St. Rep. 559. See, also, cases cited in Bigelow v. Calumet & Hecla Min. Co. (C. C.) 155 Fed. 869, 874.

[2] The determination of this case must therefore turn upon the answer to the question whether the restraint imposed was merely incidental to the lease, or whether, on the other hand, the lease was a device to control interstate commerce; in other words, upon the dominant purpose of the parties in making the lease. This is a question of fact, to be determined from all the circumstances of the case. The question as presented here is in some respects novel, and is not entirely easy of solution. The oral evidence was taken in open court, and consisted of the testimony of the representatives of the respective parties who, on behalf of their principals, negotiated the lease in question. Upon a careful consideration of this testimony, in connection with the documentary evidence, and giving due consideration to the opportunity possessed by the trial judge to determine the weight to be given the testimony of the witnesses, we are disposed to agree with the conclusion reached by the court below, that the agreement violates the federal anti-trust law. Among the important considerations which lead to this conclusion are these:

For 12 years previous to the making of the lease in question a monopoly of river and lake transportation between the points named in the charter party in question had been maintained under a pooling arrangement between the owners of the respective lines of boats, including the parties to this litigation, with the exception of one year, during which there was a division of territory. During the years 1897, 1898, and 1899 there were four companies in the pool. By the time this pooling arrangement expired, two of the four parties had disposed of their interests to the other two, who became the parties to the 1900

186 F.—5

arrangement in question, the libelant having made a sale on credit of one of its boats and the respondent having acquired a third boat. The arrangement of 1897 to 1899 was held by the Supreme Court of Michigan, in a suit brought by appellee here against the remaining parties to the agreement, for contribution on account of a recovery for personal injuries, to be an unlawful combination under the federal antitrust law. White Star Line v. Star Line of Steamers et al., 141 Mich. 604, 105 N. W. 135, 113 Am. St. Rep. 551. It is conceded here that the agreement of 1897 to 1899 was in violation of that law, and it is apparent that the object of the arrangement for the entire period between 1888 and 1899 was a monopoly of the traffic in question. We cannot regard this fact as immaterial in arriving at a determination of the dominant purpose of the parties in making the lease. In our opinion the previous relations of the parties, while not necessarily controlling, furnish a valuable sidelight upon the purpose of the agreement here in question. The case before us must be determined upon its own peculiar facts. The district judge seems to have reached the conclusion that the object of the appellee in chartering the Idlewild was to eliminate appellant's competition, and that in making the charter he "aimed at the same control of the traffic which he had before," and that the appellant entered into the contract with the knowledge of its purpose and effect as restraining competition. The charter for the years 1900 to 1902, which is before us, produced the result accomplished by the arrangements between 1888 and 1899 and was intended to do so. The district judge found as a fact that the rentals paid for the use of the Idlewild were greatly in excess of the earnings of that steamer. We think the testimony sustains that conclusion. While there is some conflict of testimony, we think it a reasonable deduction that the annual rental fixed was practically an average of the annual earnings of the Idlewild during the 12 years' existence of the pooling arrangement, and that this amount was about $4,000 greater per year than the Idlewild was able to earn, except as her share of the earnings under a practically complete monopoly of this traffic. Indeed, the appellee's manager testified:

"From an earning standpoint, in the hands of anybody, she (the Idlewild) perhaps was worth only $9,000, but in our hands and to do away with opposition, she was worth $13,000 to us."

It is urged that the Idlewild could not have competed with the appellant's three boats, and that the former must therefore, had this lease not been made, have remained out of commission. But we are not satisfied that such is the case. Indeed, as we understand the record, appellant's manager conceded that he might have used the Idlewild on the route between Detroit and Toledo; and it is by no means clear that appellant would have experienced any difficulty in supplementing the Idlewild with another boat, if necessary to maintain competition. There is also evidence that appellant's manager had, or claimed to have, such competition in mind if the lease in question were not made.

If it was the dominant purpose of both parties, when making the lease, to preserve the monopoly which they had participated in creat-

ing, and in maintaining for a period of years, the contract was, in our judgment, none the less invalid, from the fact that the lessor, instead of receiving for the use of the boat a share of the profits of a pool, obtained as annual rental an amount which experience in the pool showed was the average annual earnings assigned to the boat in question—an amount materially larger than the boat could have itself earned while operated under the lease.

This must be so unless we are prepared to hold that a combination made for the purpose of maintaining a monopoly is made lawful by the fact that the rental of one of the boats used in the combination was fixed in amount. Can it make any difference with the result that the lessor did not propose the insertion of stipulations against competition, if he knew that the object of the lessee was to effect a continuance of the monopoly which had been maintained by the participation of the parties up to that time, and that such would be its effect, and approved of such result, knowing that it, as lessor, was receiving a rental which could only be paid because of the securing of such monopoly?

In view of the circumstances which have been just stated, did the form the transaction took make it any less a contract in restraint of trade? Should not in such case the dominant purpose of both parties be held to be to restrain commerce?

In United States v. Trans-Missouri Freight Ass'n and in United States v. Joint Traffic Ass'n, supra, is found language sustaining the inference that a lease and sale stand upon the same basis. It must be conceded that there is no necessary difference between rules pertaining to sales and leases. It seems obvious, however, that a lessor may have a greater interest in creating and maintaining a monopoly than a vendor from the fact that on the termination of the lease the lessor, as the owner of boats suitable for the traffic in question, would be interested in the existence of as little competition as possible. The fact that, as we understand the record, appellant did engage in the river and lake traffic in question, upon the expiration of the charter under consideration, lends color to the view that it was to appellant's interest to maintain the same arrangement in which it had participated during the years previous to the charter in question. The fact that the parties did not renew their arrangement on the expiration of this charter is not significant, for by the time it had expired the parties were in litigation, first, in the suit in the state court referred to, and, second, by the institution of the present suit for rental under the charter in question here—in which cases the reciprocal defenses were made that the respective agreements were in contravention of the federal statutes. It is to be noted, as of some pertinency, that by the fifth paragraph of the lease appellee specifically agreed that the leased boat should be operated in connection with his other steamers over the same routes which had been so controlled by the parties for many years preceding.

The theory on which stipulations against competition in connection with bona fide sales have been held not to violate the federal anti-trust law is that such restraint is no greater than required for the protection of the legitimate interests of the vendee, and that such restraint is therefore merely incidental to the main purpose, to wit, the sale and purchase. See United States v. Trans-Missouri Freight Ass'n; United

States v. Joint Traffic Ass'n; Bement v. National Harrow Co.; Cincinnati Packet Co. v. Bay; Davis v. A. Booth & Co., heretofore cited.

On the other hand, if the restraint imposed is greater than necessary to afford a fair protection to the legitimate interests of a vendee or lessee, the contract is rendered void. Shawnee Compress Co. v. Anderson, 209 U. S. 423, 425, 28 Sup. Ct. 572, 52 L. Ed. 865. The same test has been recognized by this court in several cases under the common law, including Hitchcock v. Anthony, 83 Fed. 779, 28 C. C. A. 80; American Strawboard Co. v. Haldeman Paper Co., 83 Fed. 619, 27 C. C. A. 634; Knapp v. S. Jarvis Adams Co., 135 Fed. 1008, 70 C. C. A. 536; Prame v. Ferrell, 166 Fed. 702, 92 C. C. A. 374.

Can this test apply, that is to say, can the lessee be said to have legitimate interests to protect, when his dominant purpose in taking the lease, and which is approved by the lessor, is to continue a monopoly which both have participated in creating and maintaining? We are constrained to the opinion that the district judge did not err in holding the agreement unlawful.

It is urged that, even if the agreement in relation to the interstate commerce route between Detroit and Toledo is void, the remainder of the contract may be enforced as valid. There is in our judgment no force in this contention. The contract is entire and indivisible. The only use which respondent had of the Idlewild was under the contract, and that being void, and no basis existing for an apportioning of earnings under the interstate route from those earned wholly within the state, and thus no means of separating the legal from the illegal provision, it follows that no recovery can be had.

SEVERENS, Circuit Judge (dissenting). In my opinion the judgment proposed by the majority of the court is erroneous; and, as the subject is one of much interest to the business public, and my conviction is so positive that the decision is not in accordance with the settled interpretation of the Sherman act, I think it my duty to record my dissent and state the reasons for it.

I assume as a postulate that the act is not intended to prohibit that class of contracts so long sanctioned, whereby the owner of property or business, for a valuable consideration, conveys it, or some valuable interest in it, to another, and at the same time and for the same consideration agrees not to do anything which shall tend to diminish the value of the subject-matter of his conveyance, whether it be of a business or of some specific real or personal property.

A lease of a vessel for employment on a certain specified route on which the owner has hitherto employed it is a proper contract in which such a stipulation may be made. The contract which these parties made is not obnoxious to the provisions of the act referred to. It is not affected by the circumstance that these parties had before that time been in a combination with other parties which was, and had been adjudged to be, illegal. As to any new agreement, they had the same capacity and privilege as other people to make contracts concerning their property and business. Whether such new contract offends the law depends upon its stipulations. If they are not unlawful and their due performance is not unduly prejudicial to the

public, they cannot be impeached by suspicion or even proof that the parties intended something wrong so long as that proof does not go to any act or fact extraneous to the contract. Intentions do not count in business transactions unless they are carried into effect by a contract.

Judge Andrews in the course of an elaborate opinion upon this subject, delivered in the case of Diamond Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464, said:

"We are not aware of any rule of law which makes the motive of the covenantee the test of the validity of such a contract. On the contrary, we suppose a party may legally purchase the trade and business of another for the very purpose of preventing competition, and the validity of the contract, if supported by a consideration, will depend upon its reasonableness as between the parties."

And this defendant is not claiming that there was any stipulation outside the contract which made it other than what it purports to be. On the contrary, the defendant plants its defense upon the contract itself and in its answer to the libel sets it up as a valid defense. There is no suggestion of any extraneous stipulation which by its association with the contract would make it unlawful. It is true the answer sets up the previous unlawful combination, and how it was denounced by the Supreme Court of the state. And then the defendant attempts to carry the taint of that transaction over into the new contract and so infect it with the same illegality. Upon what legal inference or logic this result is accomplished is not apparent. In the court below witnesses were called and testified about what seems to me to be irrelevant and immaterial subjects; and stress is laid upon the circumstance that the district judge saw the witnesses and heard them testify. But I cannot help thinking, with all due respect to the opinion of my associates, that the oral testimony adduced at the hearing in the court below was of no legal significance, both because there was no pleading which raised any issue beyond that which the reference to the contract itself and the earlier combination presented, but because the testimony referred to does not tend to show that anything more than the due performance of the contract was at any time agreed to be done, or ever was done.

Turning again to the instrument itself, the only point raised in the argument made to show that the parties agreed to do something which would be in violation of the Sherman act is that the sum agreed to be paid for the use of the vessel considerably exceeded the fair rental value of the use. This is supposed to give ground for suspicion. But what evil object the suspicion rests upon is not so "bodied forth" as to be discernible. Besides, it is the ordinary and expected thing in such cases that the vendee will pay more than the value of the principal subject of the contract, and that some part of the consideration goes for the ancillary stipulation. The defendant in its answer to the libel very properly puts the matter thus:

"That the rental price agreed to be paid for the steamers Idlewild and Arundell was largely in excess of their real rental value, and that the same was agreed to be paid in consideration of the undertaking of the libelant not to enter into competition with the defendant upon said route during the period of said contract."

Just what the Sherman act means by the term "monopolizing" is not yet settled, and it may be that it will have to be done by the processes of inclusion and exclusion. But it already seems safe enough to say that it does not include such a result as a man may attain by his own endeavor and without the suppression of competition other than such as inures to him through the ancillary stipulations of a lawful contract, such as these. There is no forbidden monopolizing in this, nor any undue restraint of trade. There was here no agreement to bring other parties into a combination, or to induce them not to enter into competition. There was no stipulation that the lessor should have any interest in the proceeds of the business which it was expected would be carried on by the lessee; nor was there any sort of combination in the enterprise. If the lessor had sold the vessel outright, and had stipulated not to compete in the business in which she was to be employed, it would have been the common case in which such ancillary stipulations have been adjudged to be lawful. Here the vessel was leased for a term of years, and the restraint which the lessor put upon itself was for the same period. All the vessels on the Great Lakes which then were or might be built and be capable of such service were as free as ever to ply the business of carriers of passengers and freight between these ports.

The defendant naively avows in its answer and makes oath that at the time when it made this contract it was advised and believed that it was valid and binding. And upon such a pledge of its sincerity we may properly assume that during the years when it was using the vessel it held to the same faith. Otherwise it would have abandoned the contract and restored the vessel to its owner. It was not until pay day arrived that it was able to see things in what it now thinks is the proper light. I do not mean to say that it is not permissible in law for a party to alter his position in this way and in circumstances where the law permits it on grounds of public policy, but the conditions are recited to indicate the duty of the court to put such a construction upon the contract and give it such effect as will make it valid and obligatory if such construction is fairly possible.

In my opinion the public interest was not impaired in any way which would render the contract obnoxious to the prohibitions of the Sherman act; and I cannot help thinking that a decision to the contrary would be opposed to the settled law, and if followed would render the making of any of this kind of contracts practically impossible, and must think that the public interest would be better served by compelling the defendant to perform its agreement.