## AMERICAN EQUIPMENT CO. v. TUTHILL BLDG. MATERIAL CO.

### No. 10128.

District Court, N. D. Illinois, E. D.

Jan. 18, 1933.

Townley, Wild, Campbell & Clark, of Chicago, Ill., for plaintiff.

Albert G. Miller and Taylor, Miller, Busch & Boyden, all of Chicago, Ill., for defendant.

JOHNSON, District Judge.

Preliminary.

1. A bill of complaint was filed by plaintiff for an accounting for certain royalties alleged to have accrued under a license granted by plaintiff as the owner of certain patents to the defendant, setting forth a royalty of 30 cents per thousand for brick, all of which was paid, and a royalty in addition thereto of $1.50 and $3 per thousand for excessive use of plaintiff's device.

2. The defendant's answer is that the said license contract was void by reason of the fact that the parties thereto violated the anti-monopoly laws of the state of Illinois and the Sherman Anti-Trust Law.

3. The facts were found by the master, and certain exceptions filed by each of the parties to the suit, are hereby overruled.

4. The cause was referred to the master for the purpose of making findings of fact, and under the order of reference the master was not called upon to state conclusions of law. The case comes before the court upon the master's report containing findings of fact.

The court approves and confirms the master's report, and his findings of fact will take the place of the findings of fact required by the Equity Rules (28 USCA § 723), and the facts will be referred to by the court only in so far as they are pertinent to reach a proper conclusion as to the law.

### Conclusions of Law.

Briefly stated, the plaintiff was the owner as assignee of letters patent covering an apparatus for handling, setting, listing, and transferring brick, under patents No. 1,205,-562 and 1,150,061, covering what is known as the brick-setting machine, and patent No. 1,474,806, covering what is known as a brick loading fork.

█ Since 1916 the defendant has been a licensee of plaintiff. It is necessary to consider the facts which have to do with the history of the brick industry of Chicago. The court considers this evidence as material, and its consideration is proper under the authority of United States v. Lake Shore & M. S. Ry. Co. (D. C.) 203 F. 295, 307, where the court said: "They forcibly urge that what was done prior to the March agreement has nothing to do with what has been done since. Objections were continuously made to the introduction of evidence tending to show conditions existing before the agreement. Complainant insists that what followed the execution of the March agreement was but a continuation of what preceded it. The fact that we have considered the evidence shows, of course, that we regard it as admissible. It cannot escape notice that some of the defendants were parties to such earlier transactions, and that others acquiesced in and adopted such transactions before the March agreement was made. Lincoln v. Claflin, 74 U. S. (7 Wall.) 132, 138, 19 L. Ed. 106; United States v. Standard Oil Co. (C. C.) 152 F. 290, 294, per Sanborn, Circuit Judge, and Circuit Judges Van Devanter, Hook, and Adams concurring. The acts and transactions of the first period therefore ought to aid in some measure to elucidate the intent and effect of the March agreement, and of the acts and transactions of the parties since, no matter what conclusion may be reached touching the second period. Standard Oil Co. v. U. S., 221 U. S. 1, 76, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; Darius Cole Transp. Co. v. White Star Line, 186 F. 66, 108 C. C. A. 165 (C. C. A. 6th Cir.); U. S. v. E. I. Du Pont De Nemours & Co. (C. C.) 188 F. 128, 134."

This applies to the facts here.

The manufacture of brick is an old industry. Due to bulk, it cannot be manufactured and delivered profitably in an area outside of sixty miles from the center of Chicago. In the Chicago area, in the years 1900 to 1909, there were periods of keen competition and other periods when the price was controlled by pools. When competition was active, the price of brick varied from $3.75 to $5 per thousand, and, when competition was stifled, as happened at times in this period, the price of brick was stabilized at from $9 to $10 per thousand. In 1900 the Illinois Brick Company was formed and acquired the plants and assets of most of the operating brick companies in the Chicago area. The purchase price was paid for by the issuance of stock in the Illinois Brick Company. Some of the yards it operated; others it dismantled and abandoned. Later a holding company was formed under the name of the Cook County Brick Company. This company leased and operated various of the brick plants in and around Chicago, but this plan was soon abandoned. In the same period indictments were returned against the representatives of the brick companies operating in the Chicago district charging violation of the Sherman Anti-Trust Law (15 USCA §§ 1–7, 15 note), and as a result of these indictments fines were paid by the defendants. Thereafter there was renewed competition among the brick manufacturers, which caused the price of brick to drop to $4.50 per thousand.

In the year 1905 and 1906 a corporation was formed known as the Central Brick Company. It received all orders for common brick in the Chicago area, and parceled out the orders among various brick manufacturers. Under this plan the price of brick was stabilized at from $9 to $10 per thousand. After approximately two years, the Illinois Brick Company withdrew from the Central Brick Company, and this plan of marketing brick was thereafter abandoned. Competition again became keen, and the price of brick dropped from $5 to $6 per thousand. At this time R. C. Penfield, then president of the American Equipment Company, plaintiff herein, began negotiations with the various Chicago brick companies, some twenty-three or twenty-four in number. Plaintiff then

owned the machine referred to as the brick-setting machine, representing that a great saving in cost and labor could be effected, and through license agreements plaintiff could regulate the production and price in common brick. He represented under license agreement that this could be done, and that he would have the right and authority to do so. After various conferences, the Illinois Brick Company, the National Brick Company, the Carey Brick Company, and five other large manufacturers were persuaded and did sign license agreements. These license agreements provided, among other things, that the brick manufactured by the licensees should be sold at the fixed price of $6 per thousand in the Chicago area for wagon delivery, unless otherwise fixed by agreement by the majority of the licensees. Under this contract each licensee was given a fixed quota of percentage of what it determined to be the total of the Chicago brick business, and each licensee in turn agreed what its quota of productions should be. Plaintiff investigated each of the yards of the licensees to determine the capacity of the respective yards. In 1911 and again in 1914 plaintiff prepared and had executed by the licensee a new form of license agreement, Defendant's Exhibits 7 and 14.

In 1925 still another license agreement was presented by the plaintiff in which all reference to the price of brick was eliminated.

The quotas assigned to the various Chicago brick companies by the plaintiff in the 1911 contracts were in part as follows:

| | Percentage |
|---|---|
| Illinois Brick Company | 52.3133 |
| National Brick Company | 14.4444 |
| Chicago Brick Company | 4.3951 |
| Carey Brick Company | 6.5926 |
| Alonzo Curtis Brick Co. | 5.7259 |
| Calumet Brick Company | 2.6371 |
| Builders Brick Company | 2.6997 |

The quotas assigned to the various Chicago brick companies by the plaintiff in the 1914 contracts were as follows:

| | Percentage |
|---|---|
| Illinois Brick Company | 57.5005 |
| National Brick Company | 14.6366 |
| Chicago Brick Company | 5.4 |
| Carey Brick Company | 7.3693 |
| Curtis Brick Company | 4.5570 |
| Calumet Brick Company | 3.6186 |
| Bach Brick Company | 3.3011 |
| Builders Brick Company | 3.6169 |

After 1909, the Illinois Brick Company from time to time purchased the following named Chicago brick companies: La Bahn Brick Company; Wisconsin Lime & Cement Company; Calumet Brick Company; Kemnitz Brick Company; Glenview Brick Company; and Harms Brick Company. The Illinois Brick Company also purchased the Curtis Brick Company, which had previously purchased the Manteno Brick & Tile Company and the Murphy & Lorimer Brick Company. The Illinois Brick Company, for a number of years prior to 1931, had been operating only about ten brickyards. The Builders' Brick Company was purchased in 1928 by the National Brick Company.

In the winter of 1915, or early in 1916, J. B. Tuthill, president of the defendant company, submitted his resignation to the Illinois Brick Company, for which he had been working, and began to build the brickyard now owned and operated by the defendant. At that time R. C. Penfield, president of the plaintiff company, visited J. B. Tuthill on several occasions, and told him that there were too many brickyards already; that Penfield could do better by him if he would not build a yard; that Penfield would see that Tuthill would get $50,000 if he would not build a yard. This offer was repeated on several occasions, and was refused by Tuthill. Later in 1916 Penfield urged J. B. Tuthill, then president of the defendant company, to sign a license agreement with the plaintiff, and told Tuthill that Penfield could stop the companies who were ambitious to sell all the brick in Chicago by increasing the "additional sum" due to the plaintiff for deliveries over such company's quota to $3 a thousand; that the agreement would stimulate and keep up the price of brick; that no brick company could afford to sell brick for less than the prevailing market price, and at the same time be penalized $3 per thousand brick sold; that the additional sums collected from the companies who overproduced and distributed to those who did not produce their quotas was satisfying them. R. C. Penfield, on behalf of the plaintiff, offered to exempt the defendant from the payment of the "additional sums" of $1.50 and $3 as described and defined in the 1914 printed form of license agreement as to all deliveries of brick less than 35,000,000 brick per year if the defendant would sign a license agreement. This provision was later incorporated into an agreement which was duly executed in the fall of 1916 by the plaintiff and defendant and is in evidence as Defendant's Exhibit 7.

After defendant signed the license agreement, plaintiff advanced to defendant $13,943.95 for the remodeling and alteration of the defendant's brickyard, the obligation to be canceled as a debt when royalties in like sum had been paid. This money was, in

effect, contributed to the defendant to induce it to sign the license agreement. The debt was duly canceled when the royalty payments by defendant reached such sum.

In 1925 plaintiff caused the license agreement mentioned in finding No. 3 to be prepared. License agreements in this form were entered into between the plaintiff and the defendant and the other licensees who were permitted by the plaintiff to manufacture and deliver such percentages of the brick deliveries of "the first five licensees" as is set opposite the names of such brick company in the column headed "Percentages":

| Companies: | Percentages: |
|---|---|
| Illinois Brick Company | 62. |
| National Brick Company | 22.2 |
| Chicago Brick Company | 5.95 |
| Carey Brick Company | 5.55 |
| Bach Brick Company | 4.3 |
| Tuthill Building Material Company (as modified by supplemental contract, plaintiff's Exhibit 2) | 5. |
| Lake View Brick Company | 4.5 |
| Lutter Brick Company | 5. |
| Brisch Brick Company | 5. |
| Bohnsack Brick Company | 5. |
| Builders Brick Company | 3.5 |

The prevailing market price of common brick in the Chicago area market did not vary from $12 per thousand from September, 1921, to May of 1931. All the licensees of the plaintiff maintained this price uniformly over this period of time. For the period from 1915 to 1930 the average net profit made by brick manufacturers in the Chicago area was approximately $1.50 per thousand delivered.

During the period from September, 1921, to September, 1931, the prices of crushed stone, torpedo, sand, and cement in the Chicago Illinois market varied widely and fluctuated continually. Defendant's Exhibit 1.

The brick-setting machine had nothing to do with the shaping or forming of brick. It was exclusively a machine for handling brick after it had been formed. The cost of the brick-setting machine varied from $1,200 to $2,000; the latter figure being the highest during the World War. The machine had a long life, the original machine being still in use, and the title to it was always retained in the licensor, but the upkeep thereof was at the cost of the licensees. The machines were useful. The defendant's brickyard has a daily capacity of approximately 300,000 brick. To set this number of brick by hand without the use of plaintiff's patented machinery 36 skilled workmen would be required, and the labor cost based on the union wage scale prevailing would be $300 per day. The same number of brick can be set by plaintiff's setting machine by 12 unskilled workmen at a labor cost of $83.92, exclusive of royalty. Thus the saving in labor cost which results from the use of plaintiff's patented brick-setting machine amounts to $216.08 per 300,000 brick where the production is maintained at that amount each day. To the labor charge of $83.92 there must be added $5 for power, making the cost of labor and power $88.92 per 300,000 brick, a saving of $211.08 over labor and cost without the use of plaintiff's machinery or 70.36 cents per thousand. From this figure the royalty of 30 cents per thousand must be deducted, resulting in a net saving of 40.36 cents per thousand brick at full capacity of 300,000 brick per day. The delivery of brick by defendant has varied from the high point in 1925 of 78,507,925 brick to the low point of 11,167,412 brick in 1930. The defendant's net saving in the use of the machine over setting by hand during the years 1929 and 1930, based on its actual output, was 23 cents per thousand. The "additional sums" of $1.50 and $3 per thousand have been ignored in computing these savings. During all the years that plaintiff had owned this patent it has been able to procure licensees only in the Chicago area, the New York area, and in one plant in Milwaukee.

Plaintiff contends that under the 1925 agreement, the one before the court, it could do legally all of the things that it contracted to do under the monopoly of its patents, and in support of its position cites Rubber Tire Wheel Co. v. Milwaukee Rubber Works Co. (C. C. A.) 154 F. 358. With this the court cannot agree, for the reason that the case dealt with the product of the patent and plaintiff's device deals with a commodity, which cannot be the subject-matter of a patent monopoly, and has to do only with the handling thereof.

Defendant contends that plaintiff's license agreement limited the licensees therein to the manufacture of brick to be handled only by the brick-setting machine, and contended further that, inasmuch as the contract provided for the payment of royalty of 30 cents per thousand, upon "brick manufactured and delivered," the licensees could not manufacture brick in excess of their quota without becoming liable for payment of royalty. With this contention the court cannot agree. It should be noted, however, in this connection, that all the yards of all of the licensees were specially equipped for handling the brick manufactured by the brick-setting machine; that they had no skilled organization necessary for the manufacture of brick by the old "handsetting" method, and, by reason of the uncertainty of what their quota could amount to, it was

not practical for them to manufacture by the old handsetting method without the use of the machines, and for the further reason that their brick kilns were not constructed in a manner suitable to that method.

The court, therefore, concludes that the practical effect of this arrangement was to limit the manufacture of brick by the licensees to the method of machine setting by use of plaintiff's device. In this connection it is necessary to consider the volume of the brick business controlled by plaintiff's licensees which amounted to 90 per cent. of all of the brick in the Chicago area.

By reference to Plaintiff's Exhibit A, it will be noted that in the years of active building operation in Chicago the annual sale of plaintiff's licensees approximated · a billion bricks. As to the independent manufacturers who contributed not more than 10 per cent. of the brick used in the Chicago area, there is some evidence to show that they undersold plaintiff's licensees using the handsetting method by $1 per thousand.

Whenever any one of the licensees exceeded their quota, they paid $1.50 per thousand additional royalty. The contract provided that, if they persisted in their overproduction, at the option of the licensor, this could be increased to $3 per thousand. The licensor collected these overages and turned them over to licensees who underproduced. The Illinois Brick Company since 1922 was chronically under this quota, so that in that period ending 1930 it received royalties, based on $1.50 per thousand (manufacturer's profit on the brick), $678,578.71, and that the total amount paid by licensees who overproduced their quota in the same period was $716,363.58, the difference in amount being divided among four companies.

In 1914 the Illinois Brick Company's quota was 57.5 plus per cent. By the acquisition of other yards its quota was increased so that under the 1925 contract it was increased to 62 per cent.

After 1909 the Illinois Brick Company began to buy up independent brickyards. Some of these were already licensees of the equipment company, others were not. Among those bought by the Illinois Brick Company were the Wisconsin Lime & Cement Company, Calumet Brick Company, Kemnitz Brick Company, the Glenview Brick Company, and the Harms Brick Company. The Murphy & Lorimer Brick Company and the Manteno Brick & Tile Company were purchased by the Curtis Brick Company, and thus enlarged the Curtis Brick Company,

and itself was purchased by the Illinois Brick Company. Some of the plants purchased were never used. These facts must be regarded as significant, the chronic underproduction of the Illinois Brick Company is noted, by reason of which it received in eight years a cash bonus for its underproduction of $678,578.71. It is also significant that the plaintiff licensor had been able during all of the years to introduce its brick-setting machine only in the New York and Chicago areas, with the exception of one yard in Milwaukee, and this notwithstanding the fact that common brick are manufactured in substantially all parts of the United States in huge quantities; that R. C. Penfield, the president of the company, withdrew from 1916 to 1920, from the plaintiff corporation, a total sum of $481,227.64, which was written off by resolution of the board of directors because its president had spent the money on behalf of the plaintiff company and its licensees, and also that some of the money was recovered by plaintiff from its licensees, and for a further reason—that the debt was absorbed by the company because Penfield, its president, had spent the money in furthering the interest of the company by way of advertising, promotion, and entertaining, and in connection with federal and state investigations. No evidence appears in the record of any actual advertising or promotion work.

Plaintiff contends that the court is limited in its consideration of this case to the naked terms of the contract. This was not a contract merely between the parties to this suit. It bound all the licensees together as to the limited use of plaintiff's device. An elaborate system of reports and audits maintained by plaintiff made it possible for each of the licensees almost daily to know what the other licensees were producing and selling. If plaintiff's contention were true, then it would be difficult for the courts to ever reach a condition where the State Anti-Monopoly Laws (Smith-Hurd Rev. St. Ill. 1933, c. 38, § 569 et seq.) and the Federal Sherman Anti-Trust Law (15 USCA §§ 1-7, 15 note) are violated. To reach a proper conclusion, it is necessary to view all that the parties did under the contract and to ascertain the purpose and intent of the parties in view of the past history of those who have entered into the enterprise, as stated by the court in U. S. v. Lake Shore & M. S. R. Co. supra. Looking back then over the history of thirty years in this industry, and finding the constant purpose of the men engaged in that industry to stifle competition and control pric-

es, a court would be blind indeed if it said no inference is to be drawn from that. Light is shed upon the purposes that were in the mind of the plaintiff and its licensees when it is noted that the patent monopoly that the plaintiff owned and was entitled to under its patents was not extended beyond the New York and Chicago areas. Also that the natural impulse of owners of patent devices is to secure profit from royalty. A natural course of conduct would have been to have leased its appliances to whosoever would use them and to be content with the royalty paid, without becoming a business partner of its licensees as it did in the instant case.

██ While it is true, as contended by plaintiff, that the owner of a patent may grant or withhold its sale or use as it sees fit, it may not do those things which extend its patent monopoly beyond the monopoly granted by the patent laws, and the patent monopoly will not make it immune against violation of either the State Anti-Monopoly Law or the Sherman Anti-Trust Law. Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 S. Ct. 9, 57 L. Ed. 107. There is an abundance of authority that may be cited in support of this principle of law.

The maintenance during this long period of time of the fixed profit of $1.50 per thousand, and the fixed price to the brick consuming public of $12 per thousand, viewed in the history of this industry, is more than a coincidence, and was brought about by other means than the use of the patent devices.

Plaintiff has shown that the cost of brick in Chicago was much lower than the cost of brick in other cities, which appears in Plaintiff's Exhibit N. This, it may be noted, was true by reason of the favorable clay conditions around Chicago which are suitable for brickmaking purposes in an economical way, and it is no answer to the charge made by the defendant in this case.

All of this, coupled with the fact that the principal licensee, the Illinois Brick Company, bought up yards which it never used and increased its quota beyond what it could possibly sell, so that without having sown it reaped a harvest of $678,578.71. An item of the plaintiff company shows that its president expended the sum of $481,227.64 for advertising, entertaining, and promotion, where its customers were limited to a number that its officers could remember without resorting to their books and dealt with daily. The fact that a portion of these funds were expended in connection with state and federal investigations leads one to ask why the owner of a patent should extend its interest to federal and state investigations if its practices were within the law and its business was transacted within the scope of its patent monopoly?

The law which must govern in this case is well expressed in U. S. v. Reading Co., 226 U. S. 324, 357, 33 S. Ct. 90, 98, 57 L. Ed. 243:

"It is not essential that these contracts, considered singly, be unlawful as in restraint of trade. So considered, they may be wholly innocent. Even acts absolutely lawful may be steps in a criminal plot. Aikens v. Wisconsin, 195 U. S. 194, 206, 25 S. Ct. 3, 49 L. Ed. 154, 160. But a series of such contracts, if the result of a concerted plan or plot between the defendants to thereby secure control of the sale of the independent coal in the markets of other states, and thereby suppress competition in prices between their own output and that of the independent operators, would come plainly within the terms of the statute, and, as parts of the scheme or plot, would be unlawful. Thus, in Swift & Co. v. U. S., 196 U. S. 375, 396, 25 S. Ct. 276, 49 L. Ed. 518, 524, where a plan or scheme consisting in many parts or elements was averred to constitute a combination forbidden by the act of July 2, 1890 [15 USCA §§ 1–7, 15 note], it was said:

" 'The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a body, and, for all that we can say, to accomplish it. Moreover, whatever we may think of them separately when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. It is suggested that the several acts charged are lawful and that intent can make no difference. But they are bound together as the parts of a single plan. The plan may make the parts unlawful.' "

Also Standard Sanitary Mfg. Co. v. U. S., 226 U. S. 20, 48, 33 S. Ct. 9, 14, 57 L. Ed. 107:

"The agreements clearly, therefore, transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman law. * * * The Sherman law is a limitation of rights,— rights which may be pushed to evil consequences, and therefore restrained.

"This court has had occasion in a number of cases to declare its principle. Two of those cases we have cited. The others it is not necessary to review or to quote from except to say that, in the very latest of them, the comprehensive and thorough character of

the law is demonstrated and its sufficiency to prevent evasions of its policy 'by resort to any disguise or subterfuge of form,' or the escape of its prohibitions 'by any indirection.' United States v. American Tobacco Co., 221 U. S. 106, 181, 31 S. Ct. 632, 55 L. Ed. 663, 694."

It is unnecessary to refer to the other cases announcing the same principles of law.

The conclusion is inescapable that the plaintiff and its licensees, including the defendant, were engaged in a conspiracy to violate the criminal laws of the United States as well as the state of Illinois. Its plans are "liveried in legal form," but its history and its practice sheds a light which shows the parties naked before the law, and they may be seen as they actually exist working in a conspiracy in restraint of trade and to control prices. Plaintiff cannot have the aid of this court to enforce the penalties provided for in its contract and designed to make effective the conspiracy the licensor and licensees were engaged in.

The Illinois statute makes this contract void, and, since the record shows the shipments were made out of the state, the Sherman Anti-Trust Law (15 USCA §§ 1–7, 15 note) was violated. A court of equity will refuse its aid to the parties involved for a much higher moral reason, in that it will not undertake to adjudicate the rights of parties who have been engaged in an enterprise outside of the law, and will leave the parties where it found them.

There are no equities in favor of the defendant. By its own position it stands convicted before the law, and for that reason it will not be awarded costs.

Counsel may present a decree dismissing the plaintiff's bill for want of equity, each party to pay its own costs.